# OSCAR ANDERSON *v.* COMMISSIONER
# OF CORRECTION
# (AC 31339)

Bishop, Bear and Borden, Js.

Argued October 28, 2010—officially released May 17, 2011

*Daniel J. Foster*, special public defender, for the appellant (petitioner).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, former state's attorney, and *Catherine Brannelly Austin*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

BEAR, J. The petitioner, Oscar Anderson, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court abused its discretion in denying his petition for certification to appeal and improperly rejected his claim that his trial counsel had rendered ineffective assistance.[1] We conclude that although the court abused its discretion in denying the petition for certification to appeal, it, nonetheless, properly rejected the petitioner's claim that he was prejudiced by any ineffective assistance of counsel. Accordingly, we affirm the judgment of the habeas court.

In the petitioner's direct appeal, in which we affirmed his conviction of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2) and risk

---

[1] The petitioner had two trial attorneys, one having replaced the other prior to trial. For ease of reference, we simply refer to the attorneys as counsel.

of injury to a child in violation of General Statutes § 53-21 (a) (1),[2] this court summarized the underlying facts as follows: "In 1997, the [petitioner] and the victim's mother met at their place of employment and became romantically involved. Shortly thereafter, when the victim was seven years old, the [petitioner] moved into the mother's household. The mother worked the second shift and was not at home when the victim returned from school. The [petitioner], who worked a different shift, was there. At first the victim and the [petitioner] had a good relationship, but later the victim told people she did not like the [petitioner].

"The [petitioner] punished the victim. The [petitioner] struck her face with his hand when he was angry because she had not done her homework correctly. She did not tell her mother about this because she was afraid of what the [petitioner] might do. On one occasion, the [petitioner] hit her so hard her nose bled. The [petitioner] also compelled her to hold a book bag filled with tapes and clothes on a stick over her head for long periods of time. On another occasion, he made her kneel on grains of rice. Although the victim did not tell her mother about these events, she confided in her best friend. The friend's mother testified that she noticed behavioral changes in the victim beginning in 1998. The victim, who had been carefree, had become quiet and withdrawn. The victim's grades suffered, and she exhibited a poor attitude at school. After school one day, the victim was terrified to go home on the school bus. Her teacher and school principal conferred with her mother. The victim, however, had not told anyone other than her friend that she was afraid of the [petitioner].

"The victim also testified that the [petitioner] made her rub his back or his feet while he was wearing only

[2] The petitioner also had been charged with one additional count of sexual assault in the first degree, of which the jury found him not guilty.

his underwear. In addition, he called her into the bedroom and asked her to rub his private parts. One night she woke up and the [petitioner] was attempting to put his penis in her mouth. She reported this to her mother who told her that she must have been dreaming. The victim testified that the [petitioner] had sexual intercourse with her by putting his private into [her] butt. When she was nine and in the fourth grade, the [petitioner] had intercourse with her almost every other night or twice a week. The [petitioner] forced the victim to have oral, anal and vaginal intercourse with him.

"The victim did not tell her mother about the incidents of sexual abuse until shortly after a fire occurred in their home, the day after Thanksgiving, 2000. The victim was spending time with her grandmother who overheard her talking to herself. The grandmother insisted that the victim tell her what she was talking about. The victim told her grandmother of the [petitioner's] sexual abuse. The grandmother informed the mother and immediately took the victim to the police station. The victim gave a statement to the police in which she related the [petitioner's] sexual abuse. The police advised the victim's mother to take her to a hospital that specialized in assessing children who are victims of sexual abuse. The mother followed the advice of the police. The victim was examined by Judith Kanz, a certified pediatric nurse practitioner, who specializes in child forensic medical examinations.

"The [petitioner] testified that the victim did not like him because she felt that he was replacing her father and because he planned to marry her mother. He admitted that he disciplined the victim for not doing her homework or her chores. As punishment, he took away the victim's privileges or gave her time outs. He also testified that he made the victim hold a stick on which an empty book bag was suspended for five minutes. The [petitioner] denied that he had sexually assaulted

the victim. Following the jury's [guilty] verdict, the [petitioner] . . . was given an effective sentence of eighteen years in prison, ten years of probation and special conditions of probation as a sex offender." (Internal quotation marks omitted.) *State* v. *Anderson,* 86 Conn. App. 854, 856–59, 864 A.2d 35, cert. denied, 273 Conn. 924, 871 A.2d 1031 (2005); see also *State* v. *Anderson,* 119 Conn. App. 98, 985 A.2d 1096 (2010) (vacating petitioner's sentence on risk of injury charge and remanding case for resentencing).

Subsequently, the petitioner filed a petition for a writ of habeas corpus, alleging that his confinement was illegal because he had been denied the effective assistance of trial counsel. In an oral decision, the habeas court denied the petition, concluding that the petitioner had failed to prove that he had been denied the effective assistance of trial counsel under the two-pronged test set forth in *Strickland* v. *Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).[3] Although primarily focusing its analysis on the prejudice prong, the court concluded, nonetheless, that the petitioner had failed to meet either prong of the *Strickland* test. The court later denied the petitioner's request for certification to appeal. This appeal followed.

"In a habeas appeal, although this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . . Faced with

---

[3] Under the test established by *Strickland* v. *Washington,* supra, 466 U.S. 687, a petitioner alleging ineffective assistance of counsel must establish that "(1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction,* 288 Conn. 53, 63, 951 A.2d 520 (2008).

a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, he must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on its merits. . . .

"To prove an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." (Internal quotation marks omitted.) *Harris* v. *Commissioner of Correction*, 121 Conn. App. 240, 243–44, 994 A.2d 685, cert. denied, 297 Conn. 926, 998 A.2d 1193 (2010); see *Strickland* v. *Washington*, supra, 466 U.S. 687. With those standards in mind, we now turn to the petitioner's claims.

On appeal, the petitioner first claims that the court improperly denied his request for certification to appeal from its denial of his petition for a writ of habeas corpus. He asserts that his claim of ineffective assistance of counsel is debatable among jurists of reason and, therefore, that the habeas court should have granted his request for certification to appeal. Although the habeas court found that the petitioner had failed to meet either prong under *Strickland*, we conclude that the evidence quite strongly suggests that counsel should have investigated the petitioner's claims that he had suffered from sexually transmitted diseases throughout the period that the state alleged he had been sexually assaulting

the victim and that counsel's failure to do so likely constituted ineffective assistance.[4] Notwithstanding our ultimate conclusion that counsel's ineffectiveness did not prejudice the outcome of his criminal trial, we believe that reasonable jurists could disagree as to whether the petitioner has demonstrated that he was prejudiced by counsel's deficiencies in performance. On this basis, we conclude that the habeas court should have granted the petition for certification to appeal. However, because we agree with the habeas court's assessment of the petitioner's claim regarding *Strickland*'s prejudice prong, we affirm the court's judgment denying the habeas petition.

The petitioner bases his underlying claim of ineffective assistance of trial counsel principally on counsel's alleged failure to introduce exculpatory evidence regarding the petitioner's history of having sexually transmitted diseases; retain a medical expert or challenge the state's medical evidence; and "investigate, perform effective discovery or impeach the alleged victim's testimony." The focus of the petitioner's arguments on appeal is that he told his attorneys that he had suffered from sexually transmitted diseases during the time that he was said to have been sexually assaulting the victim. He contends that counsel failed to secure medical records and testimony concerning whether the victim had contracted these diseases, that counsel should have retained an expert to testify that the petitioner had these diseases during the relevant time periods, and that counsel should have secured expert testimony concerning the likelihood of transmission of these diseases during sexual contact. This, he argues, would have persuaded the jury that the victim

---

[4] We say "likely" in this regard on the basis of our conclusion that we need not undertake a detailed analysis of *Strickland*'s first prong in this instance because of our belief that counsel's likely ineffectiveness does not erode our confidence in the judgment.

likely would have contracted these diseases from the petitioner if the petitioner had been sexually assaulting her in the manner alleged. After thoroughly reviewing the record, we conclude that the petitioner has failed to prove that he had sexually transmitted diseases that would have infected the victim during the time he was sexually assaulting her. Consequently, he did not prove that he was prejudiced by the alleged failures on the part of his counsel to investigate his sexually transmitted disease claims.

After hearing the evidence at the habeas trial, the court issued an oral ruling, which provides in relevant part: "The issue [in this case] is whether the petitioner suffered from a sexually transmitted disease, which, in his assertion, should have been communicated to the victim had the events taken place [as alleged]. . . . [I]t is clear from the evidence that was produced that the petitioner on November 16, 1997, did, in fact, test positive for the presence of the chlamydia bacteria. Those same records establish that in November of 1997, the petitioner was treated for this chlamydia infection.

"The testimony by Dr. [Stephen] Scholand [the medical expert for the respondent, the commissioner of correction] is that chlamydia can be eliminated from the body if treated with antibiotics. The medical records support that there was an antibiotic treatment, and it would take approximately a week to eliminate the active chlamydia infection. There is no further evidence of any chlamydia infection from which the petitioner suffered. . . . January, 1998, is the earliest date of sexual contact. By January of 1998, the petitioner would have been clear of the chlamydia infection. So, the absence of any chlamydia infection in the victim [would not have] serve[d] as an exculpatory piece of evidence. . . .

"[W]hen I look at the evidence that has been presented here, I have the testimony of the petitioner, who

testifie[d] that he suffered from various sexually transmitted diseases. I have the medical records to support that. I have no reason to disbelieve that the petitioner did, in fact, suffer from various sexually transmitted diseases. The evidence and the petitioner's testimony is not inconsistent in establishing that the latest date upon which a chlamydia infection existed was November 16, 1997.

"Now, what I don't have is . . . any evidence as to whether the victim in this case did or did not suffer from a chlamydia infection. So, I can't make a conclusive finding as to whether she, in fact, did suffer from such infection. But if I take the premise that the petitioner is putting forward, that he, in fact, was positive for chlamydia in November of 1997, and even if we assume that the evidence would have shown that the victim was negative, that still doesn't go to exonerating.

"First of all, based upon the testimony that I've received here today, it is highly likely that in January of 1998 when the sexual abuse began, the petitioner was not infectious. Even if he [were] infectious, there is still a 70 percent chance that the partner, in this case unwilling, would not be infected. . . .

"In this case, it's difficult to find that there's been deficient performance [by counsel]. To be sure, the petitioner did inform [counsel] that he had had sexually transmitted diseases; however, the petitioner did not ever produce any sort of medical record to support that [as had been requested by counsel]. . . . But even if the court makes the assumption that it was deficient performance not to investigate the sexually transmitted disease issue, it is, however, crystal clear that on the basis of the testimony I've heard today, there's been no prejudice that could have occurred. Had it been investigated and even assuming that the victim was negative for chlamydia, the testimony that I heard today

is clear that that does not in any way exonerate the . . . petitioner . . . . [B]ased on the evidence presented, I cannot find that the performance by either attorney is in violation of the standard set forth in *Strickland* v. *Washington* [supra, 466 U.S. 687]."

The petitioner argues that he repeatedly was diagnosed with sexually transmitted diseases throughout the entire period that he was alleged to have been sexually assaulting the victim and that the court credited this evidence.[5] Thus, he argues, whether the victim contracted any of these diseases from the petitioner may have had an effect on the jury's verdict. He argues that if the victim did not contract any diseases from the petitioner, "the medical evidence at least [would raise] a reasonable doubt as to [the petitioner's] guilt, particularly in light of the weakness of the state's case."[6]

[5] As we have noted, the court specifically found: "I have the testimony of the petitioner, who testifie[d] that he suffered from various sexually transmitted diseases. I have the medical records to support that. I have no reason to disbelieve that the petitioner did, in fact, suffer from various sexually transmitted diseases. The evidence and the petitioner's testimony is not inconsistent in establishing that the *latest date upon which a chlamydia infection existed was November 16, 1997.*" (Emphasis added.) Despite the petitioner's argument, our reading of this statement by the court is that the court found that the petitioner had testified that he had various sexually transmitted diseases and that the medical records supported that he had a history of these diseases. We note that each of the medical records states that the petitioner had a history of sexual transmitted diseases. The court then stated that it believed that the petitioner did suffer from sexually transmitted diseases but that the latest *confirmed* date of infection was November 16, 1997.

[6] We note that the petitioner did not provide any evidence at the habeas trial to support his contention that the victim likely did not have a sexually transmitted disease. Although the record demonstrates that he attempted to secure the department of children and families' records related to the victim, there is nothing in the record before us that demonstrates any attempt to secure her medical records that were in the possession of her doctors or the hospital where she was examined, diagnosed and treated once her allegations came to light. Accordingly, he made no evidentiary attempt to prove through her medical records whether the victim had any sexually transmitted diseases during the time period that he was sexually assaulting her. We also do not agree with the petitioner's assertion that the state had a weak case.

Although the petitioner argues that his medical records and the testimony of his medical expert, Timothy Grady, proved that he had sexually transmitted diseases throughout 1997–2000, his claims in this regard are not substantiated by the records adduced at trial. We conclude that the record does not demonstrate that the petitioner's "diagnoses" were substantiated by the penile cultures that were taken from the petitioner during his hospital visits. Prior to the time that the petitioner was alleged to have begun sexually assaulting the victim, he went to St. Mary's Hospital in Waterbury, on November 16, 1997, complaining of a possible sexually transmitted disease. His medical records for that visit show that he was prescribed two forms of medication, and a urethral culture was taken from him and sent to the laboratory for analysis. The culture came back positive for chlamydia. Then, on January 6, 1998, the petitioner again went to St. Mary's Hospital complaining of a swollen left hand and a possible venereal disease. There is no indication that any cultures were taken during this visit to provide objective substantiation of the petitioner's self-diagnosed complaint of a possible venereal disease. Nevertheless, he was prescribed medication. On June 28, 1998, the petitioner again went to St. Mary's Hospital complaining of penile discharge and possible venereal disease. The petitioner again was prescribed medication, and cultures were taken from the petitioner, which were sent to the laboratory for analysis and confirmation of any sexually transmitted diseases. There is no indication in the medical records, however, whether those cultures proved positive for any sexually transmitted diseases. On October 4, 1998, the petitioner returned to St. Mary's Hospital and initially was diagnosed with a urinary tract infection. We agree that the record for this visit includes a notation that he also was diagnosed with a sexually transmitted disease. This diagnosis, however, was not

based on any laboratory findings. Indeed, as a result of this visit, another urethral culture was taken and sent to the laboratory for analysis, and the petitioner again was prescribed medication. The laboratory results of this culture, however, proved to be *negative* for sexually transmitted diseases. Thus, the laboratory report contradicts the notation on the petitioner's medical record for this visit. On October 15, 1999, the petitioner again went to St. Mary's Hospital, where a diagnosis of a "disorder of [the] penis" was noted on his patient registration form. The physician evaluation form stated that the petitioner had a probable sexually transmitted disease. Penile cultures were taken and sent to the laboratory for analysis, and the petitioner again was prescribed medication. The record, however, does not reveal the laboratory results of that culture.

From our review of the medical records in evidence at the habeas trial, we conclude that these records contained only one objectively substantiated diagnosis of a sexually transmitted disease and that such substantiated diagnosis occurred in November, 1997, prior to the petitioner's having sexually assaulted the victim. The petitioner, at that time, was treated with medication. All of the remaining records, although containing essentially the same physical complaints by the petitioner, either contain no laboratory results or they contain results that were *negative* for sexually transmitted diseases. The petitioner offered no explanation at the habeas trial as to why the scientific laboratory results were absent from his medical records, and he did not produce anyone from the hospital to explain the absence of the laboratory findings from his medical records.

We also carefully reviewed the testimony presented at the habeas trial, which further supports our conclusion that the petitioner failed to prove that he had sexually transmitted diseases during the period he was sexually assaulting the victim. The petitioner's medical

expert, Grady, was asked on direct examination: "In your review of [the petitioner's] medical records from St. Mary's, was [the petitioner] infected with any [sexually transmitted diseases] during that time?" Grady responded: "Well, he certainly presented with complaints of [sexually transmitted diseases] on a number of occasions. We did not—I was at least not provided with the culture results of several of those visits, so *I don't know if, indeed, he was ultimately confirmed to have those diseases,* but there were certainly multiple occasions throughout 1997 and 1998 and 1999 where he presented with signs and symptoms and was treated empirically for [sexually transmitted diseases], specifically, gonorrhea and chlamydia. And there was at least one positive culture for chlamydia." (Emphasis added.) Our review of this testimony demonstrates that even the petitioner's own medical expert could not state with any reasonable degree of medical certainty that the petitioner actually had sexually transmitted diseases at the time he was tested, with the exception of the one confirmed result in November, 1997, before the petitioner began to sexually assault the victim and for which he received medication to treat the disease. Accordingly, it is clear to us that the petitioner failed to prove that he had one or more sexually transmitted diseases during the time that he was sexually assaulting the victim.[7]

---

[7] Furthermore, the habeas court found that even if the petitioner had been infected during the time he was alleged to have been sexually assaulting the victim, this would not have exonerated the petitioner because there was a 70 percent likelihood that the victim would not have become infected by the petitioner. This finding is not challenged on appeal, and it does find support in the record testimony of Scholand.

Scholand testified that a person who has chlamydia has a 30 percent chance of infecting his sexual partner. In response to the petitioner's question as to whether the chances of contracting the disease from an infected partner increase with each new act of sexual intercourse, Scholand stated that it does not change.

Furthermore, the record clearly shows that the court found that the petitioner suffered from a sexually transmitted disease, namely, chlamydia, in November, 1997, and that he was treated for this disease at that time. The

On the basis of the foregoing, we are unable to conclude that the petitioner was prejudiced by the alleged deficiencies in counsel's performance. Neither the petitioner's medical records nor the testimony of Grady demonstrate that the petitioner had one or more sexually transmitted diseases during the period of time that he was sexually assaulting the victim. Accordingly, he has not demonstrated that he was prejudiced by counsel's failure to investigate his claims that he had sexually transmitted diseases during the time he was alleged to have been sexually assaulting the victim. In sum, although we conclude that the issues raised by the petitioner are debatable among jurists of reason and that the court, therefore, abused its discretion in denying the petition for certification to appeal, we also conclude, nonetheless, that the petitioner has failed to met his burden of proof under *Strickland* that he was prejudiced by the alleged deficiencies of his counsel. Accordingly, the court properly denied the petition for a writ of habeas corpus.

The judgment is affirmed.

In this opinion BISHOP, J., concurred.

BORDEN, J., dissenting. The majority concludes that the habeas court was correct in determining that the petitioner, Oscar Anderson, failed to establish prejudice as a result of his trial counsel's arguably constitutionally

---

petitioner does not challenge these facts. In the underlying criminal trial, in addition to being found guilty of risk of injury to a child for the physical abuse he inflicted on the victim, he was found guilty of *one count* of sexual assault in the first degree for the sexual abuse he inflicted on the victim. He was found not guilty of an additional count of sexual assault in the first degree for acts alleged to have taken place in November, 2000. The count of sexual assault on which he was found guilty alleged that he had engaged in sexual intercourse with the victim on various dates between January 1, 1998, and October 31, 2000. To find the petitioner guilty of that charge, the jury only had to find that the petitioner engaged in sexual intercourse with the victim *once* during that period of time.

deficient performance. Therefore, in the majority's view, the petitioner failed to satisfy the second prong of the test set forth in *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This conclusion, namely, a lack of prejudice, rests essentially on the contentions that the petitioner did not establish that he had sexually transmitted diseases during the relevant time period of his alleged sexual contact with the victim in the petitioner's criminal trial, and that the habeas court correctly found that the petitioner had failed to establish that the victim did *not* contract chlamydia during the period of the petitioner's alleged repeated sexual intercourse with her. Because I conclude that (1) the petitioner's trial counsel's performance was constitutionally deficient, and (2) he was prejudiced by that performance, I dissent.

The *Strickland* test is well established. "As enunciated in *Strickland* v. *Washington*, supra, [466 U.S.] 687, this court has stated: It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . *State* v. *Brown*, 279 Conn. 493, 525, 903 A.2d 169 (2006). Put another way, the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 460, 880 A.2d 160 (2005), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006). In assessing the attorney's performance, we indulge in a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance . . . . Id. To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied. . . . *State* v. *Brown,* supra, 525." (Internal quotation marks omitted.) *Sastrom* v. *Mullaney,* 286 Conn. 655, 662, 945 A.2d 442 (2008). To satisfy the prejudice prong, the petitioner need not establish that it is more likely than not that the result would have been different. Instead, "[a] reasonable probability [of a different result] is a probability sufficient to undermine confidence in the outcome." *Strickland* v. *Washington,* supra, 694. Our appellate scope of review on the question of whether the petitioner received constitutionally adequate counsel is plenary. *Moody* v. *Commissioner of Correction,* 108 Conn. App. 96, 100, 946 A.2d 1268, cert. denied, 288 Conn. 906, 953 A.2d 649 (2008).

Furthermore, it is necessary to keep in mind that in the present case the petitioner's habeas corpus claim is one of ineffective assistance of counsel, not of actual innocence. Thus, in establishing prejudice—i.e., a probability sufficient to undermine confidence in the outcome—he need only establish a reasonable probability of a not guilty verdict on the basis of reasonable doubt; he need not establish by clear and convincing evidence that he is actually innocent of the crime of which he stands convicted, as he would if he were claiming actual innocence. See *Miller* v. *Commissioner of Correction,* 242 Conn. 745, 747, 700 A.2d 1108 (1997). Translated into concrete terms in the present case, I conclude that that means that, had his trial counsel properly established that he had a sexually transmitted disease during the time period in which, according to the state's evidence, he was having frequent sexual intercourse

with the victim, and, absent any evidence that she also contracted such a disease, as I will explain, confidence in the jury's verdict of *no* reasonable doubt is undermined.

## I

To properly evaluate the petitioner's claim in the present case, it is necessary to summarize certain evidence and claims in more detailed fashion than is presented by the majority. That evidence and those claims are the pertinent evidence of sexual abuse of the victim by the petitioner, presented by the state in the petitioner's criminal trial, the pertinent allegations and claims of ineffectiveness of counsel in the present habeas corpus petition, and the pertinent evidence produced by the petitioner in the present habeas corpus trial.

## A

### The Evidence at the Criminal Trial

The victim testified in the trial that, from January, 1998, when she was seven years old, through October, 2000, a period of nearly three years, the petitioner would put his penis in her mouth, and forced her to have vaginal and anal intercourse with him "[l]ike every other night or like twice a week." The petitioner's trial counsel did not cross-examine the victim. The victim's grandmother testified, as a constancy of accusation witness, that the victim had told her that for a period of two years the petitioner had done "dirty sexual things" to her. The victim's mother, also testifying as a constancy of accusation witness, testified that the victim had told her that the petitioner would "[h]ave her put his penis in her mouth." The mother of a friend of the victim testified, as a constancy of accusation witness, that the victim had told her that the petitioner had "sexually molested" the victim. Anthony Rickevicius, a police

detective, testified, as a constancy of accusation witness, as to the victim's report of sexual abuse.[1] Judith Kanz, a certified pediatric nurse practitioner specializing in child forensic medical examinations, testified[2] both as a constancy of accusation witness and pursuant to the medical treatment exception to the hearsay rule. She had examined the victim in December, 2000, after the victim disclosed the sexual abuse by the petitioner to her grandmother and mother. Kanz testified that the victim had told her that the petitioner "put his penis in her mouth, told her to have sexual intercourse with him and put his penis in her 'butt.' " *State* v. *Anderson*, 86 Conn. App. 854, 871, 864 A.2d 35, cert. denied, 273 Conn. 924, 871 A.2d 1031 (2005). She also testified that she had examined the victim, both vaginally and anally, and that her "findings on examination were consistent with recurrent vaginal penetration. The results of [the victim's] anal examination were within normal limits." Id., 873. Kanz also testified, pursuant to the medical exception to the hearsay rule, that the victim "had reported to her in a consistent manner that the [petitioner] had performed acts that involved penile oral penetration, penile vaginal penetration, digital vaginal penetration and penile anal penetration." Id. Neither Kanz' report nor the victim's medical records were put into evidence. Id., 875 n.17.

The petitioner testified at his criminal trial. He denied ever having sexual intercourse with the victim or ever

---

[1] Apparently by oversight, the record produced for the habeas trial, which purported to be the full transcript of the criminal trial, does not contain the transcript of the morning session of March 5, 2003, when, I infer, both Rickevicius and Judith Kanz, a pediatric forensics specialist, testified. Nonetheless, summaries of the testimony of both Rickevicius and Kanz appear in the reported opinion of the petitioner's direct appeal. See *State* v. *Anderson*, 86 Conn. App. 854, 871–73, 864 A.2d 35, cert. denied, 273 Conn. 924, 871 A.2d 1031 (2005). I therefore consider it appropriate to include this testimony in my summary.

[2] See footnote 1 of this opinion.

"mess[ing] around with her sexually at all." The petitioner's trial counsel never raised, in any way, the petitioner's medical history of sexually transmitted diseases.

### B

### The Allegations, Claims and Evidence
### In the Habeas Court

The petitioner's amended petition alleged that his trial counsel's[3] performance was deficient in eleven different ways. Regarding the evidence produced and specific claims made at this habeas corpus hearing, the following allegations of counsel's deficient performance are relevant: failure to employ an expert in the pretrial stage concerning any sexually transmitted diseases that the petitioner had during periods relevant to the underlying criminal charges; and failure to produce the petitioner's medical records indicating that he was infected with a sexually transmitted disease at times relevant to the underlying criminal charges.

The evidence adduced in the habeas court, pertinent to the petitioner's claims, was as follows. As to whether he had informed either of the attorneys who represented him during the criminal trial, Jeffrey Hutcoe or John Cizik, or both, of his history of sexually transmitted diseases during the time of the sexual assaults claimed by the victim, the petitioner testified that he told both Hutcoe and Cizik that he was innocent of the sexual assault charges, that he had a history of such diseases, namely, both chlamydia and gonorrhea, and

---

[3] The petitioner was first represented by attorney Jeffrey Hutcoe, formerly of the Waterbury public defender's office. Shortly before trial, attorney John Cizik of the same office took over the file and tried the case. Nothing in this case turns on the fact of this change of representation, and the respondent, the commissioner of correction, does not claim to the contrary. I, therefore, refer to either or both Hutcoe and Cizik as the petitioner's trial counsel.

that he had been treated for those diseases at the emergency room at St. Mary's Hospital in Waterbury. The petitioner also testified that, as far as he knew, the victim had never contracted any venereal disease. Hutcoe confirmed this[4] and testified further that the petitioner had repeatedly made the point that, absent evidence that the victim had contracted such a disease, it would support the claim of innocence. Hutcoe also testified to the effect that, in response to the petitioner's statements in this regard, he told the petitioner to get him the petitioner's medical records and that because the petitioner did not do so, he "never got as far as incorporating [the petitioner's point] into the case in any way." Both Hutcoe and Cizik testified further that, in the course of informal discovery in the criminal case, they had reviewed all of the state's files on this case, which included a copy of Kanz' report of her examination of the victim.

The petitioner introduced a copy of that report, dated December 11, 2000, in which the victim stated to Kanz that, beginning when she was seven or eight years old and continuing "over the past two to three years," the petitioner, as "a regular occurrence," had had oral and vaginal intercourse with her. The report also indicated that Kanz had examined the victim, both vaginally and anally, and that cultures had been taken vaginally for chlamydia and gonorrhea, but did not indicate any results therefrom.

The petitioner also presented attorney Richard Meehan as an expert witness. Meehan, who stated that he had handled hundreds of cases involving allegations of sexual assaults of minors, first testified as to what he described as "a clear, affirmative obligation" on the part

---

[4] Cizik did not deny that the petitioner had told him of his history of sexually transmitted diseases; he testified that he did not recall whether the petitioner had done so.

of the petitioner's trial counsel to explore with the petitioner whether he had suffered from a sexually transmitted disease, "and, if so, then to develop that information medically." He went on to opine that to investigate adequately under the circumstances, the petitioner's trial counsel was required to secure his medical records and obtain the victim's medical records to determine whether she also had been infected with a sexually transmitted disease. Meehan further testified that unless her records demonstrated that she had been infected, it was incumbent on the petitioner's trial counsel to present an expert to testify that the petitioner could not have engaged in the course of sexual assault that the victim claimed to have occurred.

The petitioner introduced his medical records from St. Mary's Hospital. Those records cover numerous emergency room treatments beginning November 11, 1997, running through 1998, and ending October 15, 1999.

He also presented Timothy Grady as an expert witness. Grady is a registered nurse of approximately twenty years of experience in treating persons with sexually transmitted diseases. He had examined the petitioner's medical records and testified that, during the time period covered by the medical records, the petitioner "certainly presented with complaints of [sexually transmitted diseases] on a number of occasions. . . . I was . . . not provided with the culture results of several of those visits, so I don't know if, indeed, he was ultimately confirmed to have those diseases, but there were certainly multiple occasions throughout 1997 and 1998 and 1999 where he presented with signs and symptoms and was treated empirically for [sexually transmitted diseases], specifically, gonorrhea and chlamydia. And there was at least one positive culture for

chlamydia." Grady supported this opinion with the following specific examples taken from the medical records.

Grady testified that in November, 1997, the petitioner "tested positive for chlamydia," and the test for gonorrhea was negative. In January, 1998, "he was in the emergency department with discharge, painful urination, diagnosed with a nonspecific [sexually transmitted disease], treated for both gonococcal[5] [and] nongonococcal urethritis,[6] and set up with follow-up at the [sexually transmitted disease] clinic." In April, 1998, he "presented to Dr. [Manuel] Nunes' office complaining of urethral discharge, and at that point, he had venereal warts on the shaft of his penis . . . ." In June, 1998, "the physician who saw him in the [emergency room] refers to a history of venereal warts," and he "presented to the emergency department of St. Mary's again, again with whitish discharge and painful urination. He was diagnosed again with a nonspecific [sexually transmitted disease]. He was treated with intramuscular antibiotics and follow-up oral antibiotics. Although the record indicates that cultures were sent of the discharge from his urethra for gonorrhea and chlamydia, the results were not in the records . . . ." In October, 1998, he "again presented to the emergency department with similar complaints, discharge and painful urination or burning urination. He was noted by the [emergency room] physician at that time to have had a history of venereal diseases. . . . [T]he results of that culture for chlamydia was negative." "He grew out haemophilus parainfluenzae from one of his urethral cultures. . . . [T]hat's not [a sexually transmitted disease]. But again,

[5] "Gonococcal" urethritis describes an infection of the urethra associated with gonorrhea. Stedman's Medical Dictionary (27th Ed. 2000) pp. 764, 1914.

[6] "Nongonococcal" urethritis is defined as "not resulting from gonococcal infection; venereally transmitted chlamydia . . . is the most common cause." Stedman's Medical Dictionary (27th Ed. 2000) p. 1914.

he was diagnosed with a nonspecific [sexually transmitted disease] and treated with [intramuscular] antibiotics and oral antibiotics." In January, 1999, he "again presented to Dr. Nunes . . . with similar complaints, urethral discharge." In October, 1999, the petitioner went "back to the emergency department with white discharge and burning urination. And at that point, he mentioned to the doctor that it felt like when he had gonorrhea previously, although . . . to be fair, there's no confirmation of gonorrhea in the records . . . ."

Grady opined further as follows. The whitish discharges and painful urinations complained of by the petitioner are typical symptoms of sexually transmitted diseases. Both chlamydia and gonorrhea are communicable diseases. Furthermore, if an adult woman is having sex with a man who is infected with chlamydia, her "chance of acquiring it is 40 percent *for each sexual contact*," and for "gonorrhea, it's *50 percent with each sexual contact*." (Emphasis added.) For teenagers, the rate is higher because they "are even more susceptible . . . because they don't have any protective antibodies for [sexually transmitted diseases] or, at least, they have fewer, and they have [a] biologically [im]mature[7] cervix, which appear[s] to increase their risk for cervical infection."

The respondent, the commissioner of correction, produced, as an expert witness, Stephen Scholand, a physician specializing in infectious diseases. He had examined the petitioner's medical records and confirmed the petitioner's diagnosis and positive culture for chlamydia in November, 1997. He opined further that the transmission rate of male to female for chlamydia is 30 percent for each occurrence of sexual contact and

[7] The transcript uses the word "mature," but I have taken the liberty of correcting what, from the context, I conclude must be a mistaken transcription of what Grady said.

was not aware of a different rate of transmission from adults to children. He also confirmed that the typical symptoms of chlamydia in a male are urethritis, which is inflammation of the urethra causing a burning sensation while urinating, and serous—or a thin, watery—discharge from the penis; and, with gonorrhea, a substrate—or, a thicker, heavier—discharge from the penis. He also testified that chlamydia is cured by antibiotics, one type of which is usually given for about one week.

Based on this evidence, the habeas court took a very narrow view of the case. In an oral decision immediately following the trial, it first stated that the case "revolve[s] around the issue of chlamydia," that on November 16, 1997, the petitioner tested positive for chlamydia, that in November, 1997, he "was treated" for chlamydia, and that "January, 1998, is the earliest date of sexual contact." The court also found, however, based on both the petitioner's testimony and his medical records, that the petitioner "did, in fact, suffer from *various sexually transmitted diseases*"; (emphasis added); which necessarily would include more than just chlamydia. The court also concluded, however, that there was no evidence "as to whether [the victim] did or did not suffer from a chlamydia infection." The court concluded further that, even if it were to "take the premise that the petitioner is putting forward, that he, in fact, was positive for chlamydia in November of 1997, and even if we assume that the evidence would have shown that the victim was negative, that still doesn't go to be exonerating." This conclusion was based on Scholand's testimony that "there is still a 70 percent chance that the partner . . . would not be infected. So . . . under the best case scenario, the evidence of lack of chlamydia infection on the part of the victim is not what could colloquially be called a smoking gun. It's not a blockbuster type of evidence that when presented to the court

clearly makes the court say there's been a miscarriage of justice." Acknowledging, however, that the proper standard is whether the evidence "undermines the confidence in the conviction," the court stated that it had not "heard anything today that would allow me to reach the conclusion that the conviction is anything other than reliable."

Turning, then, to the issue of the petitioner's trial counsel's performance, the court concluded that there had not been "deficient performance." The court based this conclusion on the findings that, although "the petitioner did inform . . . Hutcoe that he had had sexually transmitted diseases . . . the petitioner did not ever produce any sort of medical record [at the investigatory stage of his criminal trial] to support that."[8]

## II

I turn, first, to the question of whether the petitioner received effective assistance of counsel at his trial. On the basis of certain undisputed facts, some of which the majority does not refer to, I conclude that he did not. Indeed, in my view this is not even a close call.

It is undisputed that the petitioner absolutely denied to his trial counsel[9] that he had ever sexually assaulted the victim; during the nearly three year time period in

[8] In this regard, the court also stated that it had not "received into evidence any of the voluminous notes that are alleged to have been prepared by . . . Hutcoe, so I cannot make any finding of fact as to whether . . . Hutcoe had noted that in his notes that were passed on to . . . Cizik for the representation of the [petitioner] in the criminal trial." It is difficult for me to make sense of the relevance of this statement because it seems to assume that the petitioner had the burden to establish not only that he told his first counsel, Hutcoe, of his medical history, but that it was his burden to establish that his first counsel transmitted the necessary information for his defense to his second counsel. In any event, I have disregarded this statement because, as I noted previously; see footnote 3 of this opinion; the respondent does not rely on any distinction between the obligations and performances of either Hutcoe or Cizik.

[9] See footnote 4 of this opinion.

question he was suffering from, diagnosed with and treated for at least two venereal diseases, namely, chlamydia and gonorrhea; and the petitioner repeatedly made the point to his counsel that, if he had engaged in the course of sexual conduct with the victim that she claimed, she likely would have been infected as well. In addition, the petitioner testified that he had told both Hutcoe and Cizik of his history of treatment for venereal diseases, and he also testified that he had been treated for those diseases at St. Mary's Hospital. Hutcoe's sole response to this was to tell his indigent client to provide him with the medical records to support his claim of innocence. Neither Hutcoe nor Cizik took the all too simple step of having their client sign a medical release form and sending it to St. Mary's Hospital with a request for the petitioner's medical records.[10] At no time during their course of representation of the petitioner did they take a single step toward even attempting to corroborate with readily available documentation his statements to them that he had a history of sexually transmitted diseases, underscored by him to Hutcoe that this would tend to undermine the victim's allegations of repeated sexual intercourse between the two, and thereby at the least lay the basis for the jury to entertain a reasonable doubt as to his guilt. And, of course, not having secured any such documentation, the petitioner's trial counsel never raised the issue of the petitioner's medical history of sexually transmitted diseases and, accordingly, did not secure an expert witness to testify to the likelihood of the victim's having contracted such a disease from the petitioner if her allegations were true. This was woefully ineffective assistance of criminal trial counsel.

Meehan testified that the appropriate standard of performance by a criminal defense counsel would have

---

[10] As I discuss in part III of this opinion concerning the prejudice prong of *Strickland*, had they done so they would have discovered a history of numerous medical diagnoses of both chlamydia and gonorrhea.

required such steps. I do not need that testimony, however, to conclude that this course of conduct—or, rather, lack of conduct—on the part of a criminal defense attorney defending the petitioner in the underlying case fell well below the constitutional standard of effective representation. The contrary conclusion reached by the habeas court is simply inconceivable to me.

Assume, for example, that an indigent civil client comes to an attorney in a simple accident case, telling his attorney that he had been injured in a car crash and had been treated in the local hospital emergency room; and assume that the attorney tells the client, "Go get me the hospital records," instead of doing what even an inexperienced lawyer would know enough to do, namely, having the client sign a medical release form for the attorney to secure and review the records. And assume, further, that the client never does secure the records and, as a result, when the case comes to trial it fails because there is no proof of harm to the client. I would have no difficulty concluding that this would be gross malpractice on the part of the attorney representing one who merely seeks damages for his injuries. Similarly, I have no difficulty concluding that the analogous conduct of the petitioner's trial counsel constituted lack of effective assistance of counsel in representing one whose liberty is at stake. The failure of his trial counsel to take a single affirmative step to secure the medical records that, as I will explain, contain corroboration of his history of both chlamydia and gonorrhea, fell below the standard of performance required by the constitutional guarantee of effective representation.

In addition, the failure to engage an expert witness to testify to the likelihood of an oral, vaginal and anal sexual partner—two or three times per week for a

period of nearly three years—contracting either chlamydia or gonorrhea from an infectious partner, which failure flowed directly from counsel's prior lack of constitutionally required conduct, contributed significantly to the constitutionally deficient performance of the petitioner's trial counsel. Indeed, the United States Court of Appeals for the Second Circuit has suggested that engaging the services of an expert witness may be constitutionally required of defense counsel in a case involving contested sexual conduct with a minor. See *Lindstadt* v. *Keane*, 239 F.3d 191, 201–202 (2d Cir. 2001). I need not, and do not, go nearly so far as that in this case, however, because the evidence presented at the habeas trial vividly illuminates what such an expert witness would have added to the petitioner's criminal defense. That evidence is the testimony of Grady that the petitioner had one confirmed case of chlamydia, and on several occasions throughout the period of 1997 to 1999 presented typical clinical symptoms of and was diagnosed with and medically treated for both chlamydia and gonorrhea. Indeed, the habeas court itself found, on the basis of both the petitioner's testimony, which the court specifically credited, and his medical records, as noted previously, that the petitioner did in fact suffer from various sexually transmitted diseases— which could only mean both chlamydia and gonorrhea, since those were the only two sexually transmitted diseases disclosed by the evidence. Grady also testified that the rate of infection for a grown woman would be 40 percent per incident for chlamydia and 50 percent for gonorrhea, and the rate would be even higher for someone of the age of the victim. Thus, the failure of trial counsel to secure an expert witness like Grady to explain to the jury the medical significance of the petitioner's medical history of sexually transmitted diseases, and its likely effect on the victim—if she were telling the truth about the petitioner's repeated sexual assaults on her over a three year period—exacerbated

counsel's inexplicable failure to secure the medical records in the first place.[11]

---

[11] The respondent argues that this court should disregard the petitioner's reliance in this appeal on his criminal trial counsel's alleged failure to consult with any experts, on the ground that those allegations were abandoned at the habeas corpus trial where "the petitioner presented no factual basis for such claims or otherwise explored these issues with counsel." I disagree. Meehan testified, in response to a hypothetical question embodying the essential factual claims of the petitioner, that "it's incumbent [on the petitioner's attorney] to obtain a medical expert who is going to come into court and testify that under those circumstances, unless the child was infected, this gentleman could not have been the one who had assaulted that child."

The respondent also asserts that the petitioner never established in the habeas court that his criminal trial counsel had not consulted with "medical experts who could have helped to establish his innocence or to undermine the evidence submitted by the state." It is true that, as the respondent asserts, in the habeas court neither Cizik nor Hutcoe was asked specifically whether he consulted with medical experts during the course of their representation of the petitioner in the criminal trial. That minor evidentiary lacuna is not, however, fatal to my review of the petitioner's claim. From the entirety of the petitioner's testimony and both Hutcoe's and Cizik's testimony, the inference is not only permissible, but, in my view, for all practical purposes virtually inescapable, that neither Hutcoe nor Cizik consulted an expert in the course of representing the petitioner in the criminal trial. In addition, it is clear from the petitioner's final oral argument in the habeas court that he did not abandon any such claim.

The petitioner testified—and I do not understand the respondent to challenge—that, at his first contact with Hutcoe, he told Hutcoe that he had had "various venereal diseases"—both chlamydia and gonorrhea—since approximately 1995, when he was nineteen years old, and that he had not sexually assaulted the complaining witness. Hutcoe testified in general as follows. The petitioner had "[a]bsolutely denied" that he had sexually assaulted the complaining witness. Early on during Hutcoe's representation of the petitioner, the petitioner told him that he had sexually transmitted diseases, and on numerous occasions the petitioner made "the point . . . that [the victim] would have [them], too." Hutcoe's only response to this information was to tell the petitioner to secure, on his own, his medical records to prove that he had had such diseases during the time in question. In response to a question regarding whether what the petitioner had told him would "factor into how [he would] handle the case," Hutcoe testified that "I couldn't get to the step of [the] analysis because I never got anything, which made me a little concerned. I wasn't sure whether it was true [or] not. I didn't doubt it, but my whole point was, ['give me something']. That's what we need to know. You need to get me something from your doctor so I know privately . . . what we're dealing with. *And I never got that, so I never got as far as incorporating it into the case in any way*." (Emphasis added.)

This brings me to the crux of this appeal, namely, the habeas court's conclusion, endorsed by the majority, that the petitioner failed to establish the second prong of *Strickland*, namely, prejudice. I turn next to that conclusion.

### III

The habeas court concluded that the petitioner had failed to establish prejudice resulting from his counsel's deficient performance because he had failed to prove that the victim had *not* contracted a sexually transmitted disease. This conclusion was based on two factors: the absence of any medical records of or testimony by the victim to the effect that she had not contracted a sexually transmitted disease; and Scholand's testimony that, for each sexual contact between an infected male and a female the transmission rate is 30 percent. I disagree with that conclusion.

Cizik testified in general as follows. He took over the file from Hutcoe shortly before jury selection. He reviewed all of Hutcoe's "voluminous" notes on the case. He did not recall the petitioner telling him of a history of sexually transmitted diseases and did not recall having any knowledge of such a history at the time of the criminal trial. He had no practice of asking clients in sexual assault cases about whether they had a history of sexually transmitted diseases. Although he did not speak before trial with Kanz, the state's pediatric forensics expert, he did see her report, which, as I discussed in part I B of this opinion, indicated that the complaining witness was tested for both chlamydia and gonorrhea, and he did not attempt to subpoena the victim's medical records because he believed he had no legal basis to do so.

In oral argument at the close of the evidence in the habeas case, the petitioner's counsel specifically referred to the fact that the petitioner had a history of sexually transmitted diseases, which his trial counsel did nothing to verify; to Meehan's testimony that the applicable standard required a diligent investigation of both the client's personal medical history and "how that medical history may affect any defenses there may be in the case"; and to the fact that had Hutcoe and Cizik performed properly in that regard "[t]here . . . would be very potent evidence . . . to present to a jury, whatever these statistics are, 30 percent, 40 percent." These arguments can be reasonably heard only as references to the need for trial counsel to have secured the petitioner's medical records and employed an expert, such as Grady, to interpret and opine on them for the jury's benefit.

I begin this part of the analysis by repeating what I said at the beginning of this opinion. The petitioner's burden, insofar as the prejudice prong of *Strickland* was concerned, was not to establish his actual innocence of the crime by clear and convincing evidence. His burden, instead, was to undermine confidence in the jury's verdict, which was necessarily based on its finding of no reasonable doubt as to his guilt based on the evidence adduced in the criminal trial. This necessarily means that he had to establish that, had his counsel performed sufficiently rather than deficiently, there would have been strong enough evidence casting doubt on the state's evidence so as to create a lack of confidence in the verdict of no reasonable doubt. Put another way, the petitioner had to establish that, as a result of his counsel's deficient performance, he was deprived of the opportunity to present to the jury evidence strong enough to undermine this reviewing court's confidence in the jury's verdict.

In my view, the petitioner has plainly met that burden. Exercising our plenary scope of review, I conclude that, had the petitioner's jury heard the available evidence of his history of sexually transmitted diseases during the relevant time period, the lack of evidence that the victim had contracted any such disease during that period, which I will discuss, and Grady's testimony, my confidence in the reliability of the jury's verdict would be undermined.

First, the habeas court's view of what was before it was unduly narrow, based on the claims made by the petitioner and the evidence that he had adduced. Contrary to the habeas court's view that the case revolved solely around whether the petitioner had chlamydia in January, 1998, the petitioner's claims were plainly broader than that. The victim had testified in the criminal trial—the transcript of which was presented to the habeas court, which it had the obligation to examine—

that she and the petitioner had repeated oral, anal and vaginal intercourse two to three times per week for a period of nearly three years, beginning in January, 1998, and ending in October, 2000. Moreover, Grady's testimony, the petitioner's medical records *and the habeas court's own findings,* established that the petitioner suffered from both chlamydia and gonorrhea on multiple occasions throughout 1997, 1998 and 1999. Thus, the court's tiny focus on whether the petitioner was suffering from chlamydia in January, 1998, ignored both the evidence and its own findings.[12] What was before the habeas court was not limited to the one month of January, 1998, but the entire nearly three year period from January, 1998, through October, 2000; and not the first sexual contact between the two in January, 1998, but the nearly 300 such contacts from January, 1998, through October, 2000.[13]

Second, the jury would have had Grady's testimony, contrary to Scholand's, that there is a transmission rate of 40 to 50 percent for each sexual contact between an infected male and a woman, and an even higher rate for a female of the age of the victim. Moreover, with this evidence a competent counsel would have been able to argue to the jury that, although this means that for each contact the chances of transmission range from 40 to 50 percent—or higher for a young female like the victim—it is extremely unlikely that every single time

[12] Also, contrary to the court's statement that there was no evidence before it that the victim had not contracted chlamydia, there was such evidence. The petitioner had testified that, to his knowledge, the victim had never contracted any venereal disease. It is true, of course, that the habeas court was not required to credit this testimony, but the court's statement does demonstrate a mischaracterization of the evidence before it.

[13] This is a conservative calculation. I have taken the victim's testimony of sexual contact of two to three times per week at its lower end, and multiplied it by the 147 weeks from January, 1998, through October, 2000. Of course, taking the victim's testimony at its higher estimate, there would have been more than 400 such contacts.

of the nearly 300 such contacts the transmission rate fell on the negative, rather than the positive, end of the scale. Put another way, the petitioner's counsel could have presented the following persuasive argument: "Ladies and gentlemen, is it really reasonable to conclude that, in the nearly 300 times that the victim says they had oral, anal and vaginal sexual intercourse, and keeping in mind that each time there was a higher than 40 or 50 percent chance of transmission, not one of those times resulted in her contracting the sexually transmitted disease that the petitioner had? Indeed, even if we take the state's evidence that there was a 30 percent chance of transmission each time, is it really reasonable to conclude that the 30 percent chance did not materialize in every one of those nearly 300 times? I suggest that the only proper answer to these questions is 'no,' and I suggest further that this means that there must be reasonable doubt about the petitioner's guilt." This argument would have been particularly persuasive because it would have been based on hard scientific evidence, rather than, as the state's case was, principally on the testimony of the victim, corroborated only by constancy of accusation testimony and Kanz' examination, which corroborated the victim's statements about vaginal intercourse but did not corroborate her statements about anal intercourse.

This necessarily brings me to the issue of whether there was evidence from which the jury would have concluded that the victim did not contract a sexually transmitted disease. I conclude that, in the context of this case, this issue is really the proverbial red herring.

I readily concede that there was no direct, positive evidence that she had not contracted a sexually transmitted disease at any time between January, 1998, and October, 2000. That is, she did not testify at the habeas hearing, and, with the exception of the petitioner's testimony; see footnote 12 of this opinion; which the habeas

court was not required to credit, there was no other evidence, such as her medical records, that addresses the presence or absence of a sexually transmitted disease. This evidentiary lacuna is, in my view, far from fatal to the petitioner's case.

First, Kanz' report of her examination and evaluation of the victim indicates that "[c]ultures for chlamydia and GC vaginally were done and an HIV, RPR and Hep B serum screens were performed." These are obvious references to sexually transmitted diseases, and the references to "chlamydia and GC" must be taken as references to the two sexually transmitted diseases that the petitioner suffered from, namely, chlamydia and gonorrhea. See footnotes 5 and 6 of this opinion. In her report, she also recommended "[f]ollow-up here pending further disclosure that may warrant further evaluation." Second, the criminal trial record is bereft of any evidence that the victim ever suffered from a sexually transmitted disease.

In light of the cultures taken from the victim, Kanz' recommendation for follow-up in the event of "further disclosure that may warrant further evaluation," and the absence of any evidence of any such further follow-up for additional treatment of the victim, it is blinking at reality to think that she may have in fact *had* a sexually transmitted disease. Put another way, had any such culture come back *positive* for either chlamydia or gonorrhea being present in the very young victim, the state would surely have asked for a physical examination or access to the medical records of the petitioner as additional proof of his guilt. Thus, this is the proverbial case immortalized in Sir Arthur Conan Doyle's famous story, "Silver Blaze," in which Sherlock Holmes solves the mystery because the dog did *not* bark. See *Perkins* v. *Freedom of Information Commission*, 228 Conn. 158, 180 n.3, 635 A.2d 783 (1993) (*Borden, J.,*

concurring). This record can only be reasonably construed as demanding the inference that the victim did not contract any sexually transmitted disease, and that inference, in turn, would have cast serious doubt about the reliability of her testimony that she engaged in sexual intercourse with the petitioner nearly 300 times over a nearly three year period. At the least, the petitioner would have been able to argue that, absent such evidence brought forth by the state, there was powerful reason to find reasonable doubt about her testimony.

Finally, I note that the state's case was far from overwhelming. It rested almost entirely, for purposes of substantive evidence, on the testimony of the victim, supplemented by several constancy of accusation witnesses. The only nonconstancy evidence supporting that testimony was Kanz' examination of her, which did corroborate vaginal but did not corroborate anal intercourse.

In sum, I conclude that the petitioner's trial counsel were deficient in their performance and that those deficiencies undermine confidence in the reliability of the verdict of guilty. I therefore would reverse the judgment of the habeas court and remand the case with direction to grant the writ of habeas corpus for a new trial.