******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PALMER, J., dissenting. I disagree with the majority that the petitioner, Oscar Anderson, was not prejudiced by the failure of his trial counsel, Jeffrey Hutcoe and John Cizik, to introduce at trial medical records concerning the petitioner's history of sexually transmitted diseases, to present expert testimony concerning the transmission rates of such diseases, and to demonstrate that the victim apparently had not contracted any such diseases during the nearly three year period in which she claims the petitioner engaged in vaginal, anal and oral sex with her two or three times per week. Rather, I agree with Judge Borden, who dissented from the opinion of the majority in the Appellate Court, that the failure of counsel to present such evidence rendered their performance manifestly deficient under prevailing norms of practice and caused material harm to the petitioner. See *Anderson* v. *Commissioner of Correction*, 128 Conn. App. 585, 609–13, 17 A.3d 1138 (2011) (*Borden, J.*, dissenting). I therefore respectfully dissent.

As the majority explains, under *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), "[a] claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, [the petitioner] must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Janulawicz* v. *Commissioner of Correction*, 310 Conn. 265, 268 n.1, 77 A.3d 113 (2013). In this context, a reasonable probability that the result of the trial would have been different "does not require the petitioner to show that counsel's deficient conduct more likely than not altered the outcome in the case. . . . Rather, it merely requires the petitioner to establish a probability sufficient to undermine confidence in the outcome." (Citation omitted; internal quotation marks omitted.) *Bunkley* v. *Commissioner of Correction*, 222 Conn. 444, 445–46, 610 A.2d 598 (1992), overruled in part on other grounds by *Small* v. *Commissioner of Correction*, 286 Conn. 707, 724, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008).

In the present case, the majority does not address *Strickland*'s performance prong in light of its determination that, even if the petitioner's trial counsel had rendered ineffective assistance, the petitioner cannot establish that he was prejudiced by their deficient per-

formance. Because I would reverse the judgment of the Appellate Court, I must address the merits of both *Strickland* prongs.

With respect to the first prong, although the Appellate Court relied on the absence of prejudice in affirming the habeas court's judgment; see *Anderson* v. *Commissioner of Correction*, supra, 128 Conn. App. 586, 591; it nevertheless observed that "the evidence quite strongly suggests that counsel should have investigated the petitioner's claims that he had suffered from sexually transmitted diseases throughout the period that . . . [he allegedly] had been sexually assaulting the victim and that [the] failure [of counsel] to do so likely constituted ineffective assistance." Id., 590–91. This observation, in my view, is an understatement. Suffice it to say that I agree with Judge Borden that whether the petitioner received effective assistance of counsel "is not even a close call." Id., 609 (*Borden, J.*, dissenting). Quite clearly, he did not. The undisputed evidence adduced in the habeas court established that the petitioner had timely informed his trial counsel that he had been treated for sexually transmitted diseases at a Waterbury hospital on numerous occasions during the relevant time frame and that, as far as he knew, the victim never had been treated for any such diseases. Indeed, the petitioner repeatedly made the point to trial counsel that, in the absence of any evidence that the victim had received such treatment, the petitioner's medical history would support his claim of innocence. Id., 604 (*Borden, J.*, dissenting). Notwithstanding this information, "[a]t no time during [the] course of [representing] the petitioner did [the petitioner's counsel] take a single step toward even attempting to corroborate with readily available documentation [the petitioner's] statements to them that he had a history of sexually transmitted diseases . . . [that] would tend to undermine the victim's allegations of repeated sexual intercourse between the two, and thereby at the least lay the basis for the jury to entertain a reasonable doubt as to his guilt. And, of course, not having secured any such documentation, the petitioner's trial counsel never raised the issue of the petitioner's medical history of sexually transmitted diseases and, accordingly, did not secure an expert witness to testify [as] to the likelihood [that] the [victim would have] contracted such . . . disease[s] from the petitioner if her allegations were true.[1] This was woefully ineffective assistance of criminal trial counsel." (Footnote added.) Id., 610 (*Borden, J.*, dissenting). The petitioner's trial counsel also failed to secure the medical records of the victim, an error compounded by the fact that they had in their possession the report of Judith Kanz, the pediatric nurse practitioner and forensics specialist who examined the victim immediately following the disclosure of the alleged sexual abuse. That report revealed that Kanz had tested the victim for a number of sexually transmitted dis-

eases, including chlamydia and gonorrhea. Id., 618 (*Borden, J.*, dissenting). If the petitioner's trial counsel had obtained the results of those tests, they would have learned that the victim tested negative for those diseases, which, in turn, would have bolstered the petitioner's claim of innocence.

The majority concludes, however, that the petitioner was not prejudiced by the inadequate performance of his trial counsel and, therefore, was not deprived of a fair trial because there was no reasonable probability of a different outcome even if the jury had been presented with the petitioner's medical records, which, as the majority acknowledges, reveal that the petitioner was treated for sexually transmitted diseases, including gonorrhea and chlamydia, on numerous occasions between November, 1997, and October, 1999, the period in which the victim claims that the petitioner sexually assaulted her two or three times per week. The majority reaches this conclusion because the petitioner's medical records also reveal that, although he was treated for sexually transmitted diseases on numerous occasions, there were no culture results confirming the diagnosis, and, consequently, the jury reasonably could have concluded that the petitioner was not actually suffering from any such disease on those occasions. The majority further posits that, even if the petitioner *was* infected with a sexually transmitted disease or diseases on each of the occasions that he visited the hospital, the respondent's expert, Stephen Scholand, a physician specializing in infectious diseases, testified that there was only a 30 percent chance that a person would contract chlamydia upon having intercourse with an infected person.[2] The majority also cites Scholand's testimony that the victim's immune system could have eradicated any sexually transmitted disease by the time Kanz examined her. The majority concludes that, because the victim's negative tests results were not inconsistent with the petitioner's guilt, and because Kanz also testified that the results of the victim's physical examination were consistent with repetitive vaginal penetration, there is no reasonable probability that the jury would have reached a different result. In reaching its determination, the majority rejects the petitioner's contention that, even if one accepts Scholand's testimony that there was only a 30 percent chance that the victim would have contracted chlamydia from having intercourse with the petitioner, the chances of transmission would have increased dramatically if, as the victim claimed, the petitioner had intercourse with her two or three times per week. The majority rejects this contention on the ground that the petitioner failed to present any evidence at trial "to support his statistical theory [or] analysis [and] . . . cannot rely on such theor[y] or analysis presented for the first time on appeal." Footnote 8 of the majority opinion.

The majority's reasoning is unpersuasive for several

reasons. First, it does not require an advanced degree in statistics or mathematics to know that the more times a person engages in sexual intercourse with someone infected with a sexually transmitted disease, the more likely it is that the person will contract that disease. On the contrary, common sense tells us that a 30 percent risk of infection for any act of sexual intercourse means that, over an extended period of time, an infected person who repeatedly has intercourse with another person will transmit the disease to that other person at a rate of three out of every ten acts of intercourse. Furthermore, as Judge Borden explained, in addition to the petitioner's and the victim's medical records, the jury also had before it the testimony of Timothy Grady, a registered nurse with approximately twenty years of experience in treating sexually transmitted diseases. See *Anderson* v. *Commissioner of Correction*, supra, 128 Conn. App. 605, 616–17 (*Borden, J.*, dissenting). In contrast to Scholand's testimony, Grady explained that chlamydia has "a transmission rate of 40 to 50 percent for each sexual contact between an infected male and a woman, and an even higher rate for a female of the age of the victim.[3] . . . [W]ith this evidence . . . competent counsel would have been able to argue to the jury that, although this means that for each contact the chances of transmission range from 40 to 50 percent— or higher for a young female like the victim—it is extremely unlikely that every single time of the nearly 300 [times that the petitioner allegedly had sex with the victim] the transmission rate fell on the negative, rather than [on] the positive, end of the scale. Put another way, the petitioner's counsel could have presented the following persuasive argument: 'Ladies and gentlemen, is it really reasonable to conclude that, in the nearly 300 times that the victim says they had oral, anal and vaginal sexual intercourse, and keeping in mind that each time there was a higher than 40 or 50 percent chance of transmission, not one of those times resulted in her contracting the sexually transmitted disease that the petitioner had? Indeed, even if we take the . . . evidence that there was a 30 percent chance of transmission each time, is it really reasonable to conclude that the 30 percent chance did not materialize in [any] one of those nearly 300 times?' "[4] (Footnote added.) Id., 616–17 (*Borden, J.*, dissenting).

I also am not persuaded by the majority's assertion that, because there were no culture results confirming a diagnosis of chlamydia or gonorrhea, a jury could have concluded that the petitioner never actually suffered from those diseases during the relevant time frame. As the majority itself observes, there was undisputed evidence at trial that "patients who visit the emergency room for treatment of sexually transmitted diseases often do not wait for culture results," and, therefore, they often are "treated 'prophylactically or empirically' " based on the symptoms with which they

present. In the present case, according to medical experts presented by both the respondent and the petitioner, the petitioner presented with textbook signs of chlamydia and gonorrhea[5] each time he visited the hospital, which undoubtedly explains why he was treated for those diseases. The petitioner's medical records also indicate that he self-reported a history of sexually transmitted diseases and informed one of the treating health care providers that his symptoms felt just like the last time he had gonorrhea. Contrary to the majority's assertions, therefore, I am not persuaded that the jury would have disregarded this evidence and concluded, merely because there were no confirmatory culture results in his hospital records, that the petitioner never actually had a sexually transmitted disease.

I also am not convinced by the majority's assertion that the jury reasonably could have concluded, on the basis of Scholand's testimony, that the victim's immune system likely would have eradicated any sexually transmitted diseases by the time she was tested for them, a fact that could explain the negative test results. I note in this regard that, although Scholand testified that a person's immune system is *capable* of eradicating a sexually transmitted disease, he was unable to provide an answer when asked how often this actually occurs and ultimately conceded that he really had no idea how often it occurs. Scholand did state, however, that it could take months or even years for the body to rid itself of chlamydia. Indeed, both experts testified that chlamydia is often asymptomatic and can stay in the body indefinitely if left untreated, causing myriad complications. I believe that the foregoing expert testimony, the petitioner's documented history of sexually transmitted diseases, the relatively high transmission rates of such diseases, and the fact that the victim tested negative for such diseases might very well have created a reasonable doubt as to the petitioner's guilt.

I recognize that this is a close case. It is, however, precisely because it is a close case that I am persuaded that the petitioner has met his burden of demonstrating that the deficient performance of his trial counsel undermines confidence in the verdict and, therefore, deprived him of a fair trial. As Judge Borden observed, "the state's case was far from overwhelming. It rested almost entirely, for purposes of substantive evidence, on the testimony of the victim, supplemented by several constancy of accusation witnesses. The only nonconstancy evidence supporting [the victim's] testimony was Kanz' [testimony regarding her] examination of [the victim], which did corroborate [the victim's allegation of] vaginal [intercourse] but did not corroborate [her allegations of] anal intercourse." *Anderson* v. *Commissioner of Correction*, supra, 128 Conn. App. 619 (*Borden, J.*, dissenting). I therefore would reverse the judgment of the Appellate Court and direct that court to remand the case to the habeas court with direction

to grant the petition for a writ of habeas corpus and to order a new trial.

[1] I note that the Second Circuit Court of Appeals has observed that, "[i]n sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel. . . . This is particularly so [when] the [government's] case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged victim, as opposed to direct physical evidence such as DNA . . . or third party eyewitness testimony." (Citations omitted; footnote omitted.) *Gersten* v. *Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005), cert. denied sub nom. *Artus* v. *Gersten*, 547 U.S. 1191, 126 S. Ct. 2882, 165 L. Ed. 2d 894 (2006).

[2] Scholand did not testify as to the transmission rate for gonorrhea. The petitioner's expert, Timothy Grady, stated, however, that gonorrhea had a higher transmission rate, that is, 50 percent.

[3] Grady further explained that the higher transmission rate for adolescent females is attributable to the fact that they "don't have any protective antibodies for [sexually transmitted diseases] or, at least, they have fewer, and they have [a] biologically [immature] cervix, which appear[s] to increase their risk for cervical infection."

[4] I recognize that the petitioner does not claim that he was infected with a sexually transmitted disease on each of the approximately 300 occasions that he allegedly had sexual intercourse with the victim. The same argument would apply, however, even if the petitioner was contagious for only two weeks on each of the five occasions that he was treated for those diseases. In other words, competent defense counsel could have argued that the odds were exceedingly low that the petitioner could have had sex with the victim even twenty or thirty times while infected with a sexually transmitted disease without infecting her. Indeed, it requires no particular expertise or training to know that, if a coin is flipped twenty times, it is extremely unlikely that it will never come up heads, even though the chances that it will come up heads remains the same for each individual flip.

[5] The petitioner's medical records indicate that the petitioner often presented at the hospital with painful urination and urethral discharge.