# SUPREME COURT OF THE UNITED STATES

ROBERT WONG, WARDEN *v.* FERNANDO
BELMONTES, JR.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 08–1263.   Decided November 16, 2009

PER CURIAM.

In 1981, in the course of a burglary, Fernando Belmontes bludgeoned Steacy McConnell to death, striking her in the head 15 to 20 times with a steel dumbbell bar. See *People* v. *Belmontes*, 45 Cal. 3d 744, 759–761, 755 P. 2d 310, 315–316 (1988). After the murder, Belmontes and his accomplices stole McConnell's stereo, sold it for $100, and used the money to buy beer and drugs for the night. *Id.*, at 764–765, 755 P. 2d, at 318–319.

Belmontes was convicted of murder and sentenced to death in state court. Unsuccessful on direct appeal and state collateral review, Belmontes sought federal habeas relief, which the District Court denied. The Court of Appeals reversed, finding instructional error, but we overturned that decision. *Ayers* v. *Belmontes*, 549 U. S. 7 (2006); see also *Brown* v. *Belmontes*, 544 U. S. 945 (2005).

On remand, the Court of Appeals again ruled for Belmontes, this time finding that Belmontes suffered ineffective assistance of counsel during the sentencing phase of his trial. The District Court had previously denied relief on that ground, finding that counsel for Belmontes had performed deficiently under Ninth Circuit precedent, but that Belmontes could not establish prejudice under *Strickland* v. *Washington*, 466 U. S. 668 (1984). *Belmontes* v. *Calderon*, Civ. S–89–0736 DFL JFM (ED Cal., Aug. 15, 2000), App. to Pet. for Cert. 140a, 179a, 183a. The Court of Appeals agreed that counsel's performance was deficient, but disagreed with the District Court with respect to

prejudice, determining that counsel's errors undermined confidence in the penalty phase verdict. *Belmontes* v. *Ayers*, 529 F. 3d 834, 859–863, 874 (CA9 2008). We disagree with the Court of Appeals as to prejudice, grant the State's petition for certiorari, and reverse.

I

Belmontes argues that his counsel was constitutionally ineffective for failing to investigate and present sufficient mitigating evidence during the penalty phase of his trial. To prevail on this claim, Belmontes must meet both the deficient performance and prejudice prongs of *Strickland*, 466 U. S., at 687. To show deficient performance, Belmontes must establish that "counsel's representation fell below an objective standard of reasonableness." *Id.*, at 688. In light of "the variety of circumstances faced by defense counsel [and] the range of legitimate decisions regarding how best to represent a criminal defendant," the performance inquiry necessarily turns on "whether counsel's assistance was reasonable considering all the circumstances." *Id.*, at 688–689. At all points, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.*, at 689.

The challenge confronting Belmontes' lawyer, John Schick, was very specific. Substantial evidence indicated that Belmontes had committed a prior murder, and the prosecution was eager to introduce that evidence during the penalty phase of the McConnell trial. The evidence of the prior murder was extensive, including eyewitness testimony, Belmontes' own admissions, and Belmontes' possession of the murder weapon and the same type of ammunition used to kill the victim. Record 2239–2250, 2261; Deposition of John Schick, Exhs. 62, 63, 64 (Sept. 26, 1995).

The evidence, furthermore, was potentially devastating. It would have shown that two years before Steacy McCon-

nell's death, police found Jerry Howard's body in a secluded area. Howard had been killed execution style, with a bullet to the back of the head. The authorities suspected Belmontes, but on the eve of trial the State's witnesses refused to cooperate (Belmontes' mother had begged one not to testify). The prosecution therefore believed it could not prove Belmontes guilty of murder beyond a reasonable doubt. What the prosecution could prove, even without the recalcitrant witnesses, was that Belmontes possessed the gun used to murder Howard. So the State offered, and Belmontes accepted, a no-contest plea to accessory after the fact to voluntary manslaughter. Record 2239–2243; Deposition of John Schick, Exhs. 62, 63, 64.

But Belmontes had not been shy about discussing the murder, boasting to several people that he had killed Howard. Steven Cartwright informed the district attorney that Belmontes had confessed to the murder. A police informant told detectives that Belmontes "bragged" about the murder, stating that he was "mad" at Howard because "the night before, he had quite a [lot] of dope and wouldn't share it with him." After double jeopardy protection set in and he had been released on parole, Belmontes admitted his responsibility for the murder to his counselor at the California Youth Authority, Charles Sapien. During his time in confinement, Belmontes had "always denied that he was the [one] who shot Jerry Howard." But because Sapien "had been square with [Belmontes]," Belmontes decided to level with Sapien upon his release, telling Sapien that he had "'wasted' that guy." Record 2240; Deposition of John Schick, Exhs. 62, 63, 64.

Schick understood the gravity of this aggravating evidence, and he built his mitigation strategy around the overriding need to exclude it. California evidentiary rules, Schick knew, offered him an argument to exclude the evidence, but those same rules made clear that the evidence would come in for rebuttal if Schick opened the door.

Record 2256; see also *People* v. *Rodriguez*, 42 Cal. 3d 730, 791–792, 726 P. 2d 113, 153 (1986); *People* v. *Harris*, 28 Cal. 3d 935, 960–962, 623 P. 2d 240, 254 (1981). Schick thus had "grave concerns" that, even if he succeeded initially in excluding the prior murder evidence, it would still be admitted if his mitigation case swept too broadly. Accordingly, Schick decided to proceed cautiously, structuring his mitigation arguments and witnesses to limit that possibility. Deposition of John Schick 301, 309–310; see *Strickland, supra*, at 699 ("Restricting testimony on respondent's character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and respondent's criminal history, which counsel had successfully moved to exclude, would not come in").

As Schick expected, the prosecution was ready to admit this evidence during the sentencing phase. Schick moved to exclude the evidence, arguing that the State should be allowed to tell the jury only that Belmontes had been convicted of being an accessory after the fact to voluntary manslaughter—nothing more. Record 2240–2254. Schick succeeded in keeping the prosecution from presenting the damaging evidence in its sentencing case in chief, but his client remained at risk: The trial court indicated the evidence would come in for rebuttal or impeachment *if* Schick opened the door. *Id.*, at 2256.

This was not an empty threat. In one instance, Schick elicited testimony that Belmontes was not a violent person. The State objected and, out of earshot of the jury, argued that it should be able to rebut the testimony with the Howard murder evidence. *Id.*, at 2332–2334. The Court warned Schick that it was "going to have to allow [the prosecution] to go into the whole background" if Schick continued his line of questioning. *Id.*, at 2334. Schick acquiesced, and the court struck the testimony. *Ibid.*

Per Curiam

The Court's warning reinforced Schick's understanding that he would have to tailor his mitigation case carefully to preserve his success in excluding the Howard murder evidence. With that cautionary note in mind, Schick put on nine witnesses he thought could advance a case for mitigation, without opening the door to the prior murder evidence. See *id.*, at 2312–2417.

The Court of Appeals determined that in spite of these efforts, Schick's performance was constitutionally deficient under Circuit precedent. *Belmontes*, 529 F. 3d, at 862–863. The State challenges that conclusion, but we need not resolve the point, because we agree with the District Court that Belmontes cannot establish prejudice.

## II

To establish prejudice, Belmontes must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U. S., at 694. That showing requires Belmontes to establish "a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing," and "that had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wiggins* v. *Smith*, 539 U. S. 510, 535, 536 (2003).

The Ninth Circuit determined that a reasonably competent lawyer would have introduced more mitigation evidence, on top of what Schick had already presented. For purposes of our prejudice analysis, we accept that conclusion and proceed to consider whether there is a reasonable probability that a jury presented with this additional mitigation evidence would have returned a different verdict.

In evaluating that question, it is necessary to consider *all* the relevant evidence that the jury would have had before it if Schick had pursued the different path—not just

the mitigation evidence Schick could have presented, but also the Howard murder evidence that almost certainly would have come in with it. See *Strickland*, *supra*, at 695–696, 700. Thus, to establish prejudice, Belmontes must show a reasonable probability that the jury would have rejected a capital sentence after it weighed the entire body of mitigating evidence (including the additional testimony Schick could have presented) against the entire body of aggravating evidence (including the Howard murder evidence). Belmontes cannot meet this burden.

We begin with the mitigating evidence Schick did present during the sentencing phase. That evidence was substantial. The same Ninth Circuit panel addressing the same record in Belmontes' first habeas appeal agreed, recognizing "the substantial nature of the mitigating evidence" Schick presented. *Belmontes* v. *Woodford*, 350 F. 3d 861, 907 (2003). It reiterated the point several times. See *id.*, at 874, 901, 908.

All told, Schick put nine witnesses on the stand over a span of two days, and elicited a range of testimony on Belmontes' behalf. A number of those witnesses highlighted Belmontes' "terrible" childhood. They testified that his father was an alcoholic and extremely abusive. Belmontes' grandfather described the one-bedroom house where Belmontes spent much of his childhood as a "chicken coop." Belmontes did not do well in school; he dropped out in the ninth grade. His younger sister died when she was only 10 months old. And his grandmother died tragically when she drowned in her swimming pool. See Record 2314–2319, 2324–2325, 2344.

Family members also testified that, despite these difficulties, Belmontes maintained strong relationships with his grandfather, grandmother, mother, and sister. *Id.*, at 2317–2318, 2325–2326. And Belmontes' best friend offered the insights of a close friend and confidant. *Id.*, at 2329–2332.

Schick also called witnesses who detailed Belmontes' religious conversion while in state custody on the accessory charge. These witnesses told stories about Belmontes' efforts advising other inmates in his detention center's religious program, to illustrate that he could live a productive and meaningful life in prison. They described his success working as part of a firefighting crew, detailing his rise from lowest man on the team to second in command. Belmontes' assistant chaplain even said that he would use Belmontes as a regular part of his prison counseling program if the jury handed down a life sentence. *Id.*, at 2379–2384, 2396–2398, 2400–2407.

Belmontes himself bolstered these accounts by testifying about his childhood and religious conversion, both at sentencing and during allocution. Belmontes described his childhood as "pretty hard," but took responsibility for his actions, telling the jury that he did not want to use his background "as a crutch[,] to say I am in a situation now . . . because of that." *Id.*, at 2343.

On remand from this Court, the Court of Appeals— addressing Belmontes' ineffective assistance claim for the first time—changed its view of this evidence. Instead of finding Schick's mitigation case "substantial," as it previously had, *Belmontes*, 350 F. 3d, at 907, the Ninth Circuit this time around labeled it "cursory," *Belmontes*, 529 F. 3d, at 841, 861, n. 14, 866. Compare also *Belmontes*, 350 F. 3d, at 874, 901, 907 (labeling the mitigation evidence Schick presented "substantial"), with *Belmontes*, 529 F. 3d, at 847, n. 3, 874 (labeling the same evidence "insubstantial"). More evidence, the Court of Appeals now concluded, would have made a difference; in particular, more evidence to "humanize" Belmontes, as that court put it no fewer than 11 times in its opinion. *Belmontes*, 529 F. 3d, at 850, 859, 860, 862, 863, 864, 865, and n. 18, 869, 872, 874. The Court determined that the failure to put on this evidence prejudiced Belmontes.

There are two problems with this conclusion: Some of the evidence was merely cumulative of the humanizing evidence Schick actually presented; adding it to what was already there would have made little difference. Other evidence proposed by the Ninth Circuit would have put into play aspects of Belmontes' character that would have triggered admission of the powerful Howard evidence in rebuttal. This evidence would have made a difference, but in the wrong direction for Belmontes. In either event, Belmontes cannot establish *Strickland* prejudice.

First, the cumulative evidence. In the Court of Appeals' view, Belmontes should have presented more humanizing evidence about Belmontes' "difficult childhood" and highlighted his "positive attributes." 529 F. 3d, at 864. As for his difficult childhood, Schick should have called witnesses to testify that "when Belmontes was five years old, his 10-month-old sister died of a brain tumor," that he "exhibited symptoms of depression" after her death, that his grandmother suffered from "alcoholism and prescription drug addiction," and that both his immediate and extended family lived in a state of "constant strife." *Ibid.* As for his positive attributes, Schick should have produced testimony about Belmontes' "strong character as a child in the face of adversity." *Ibid.* Schick should have illustrated that Belmontes was "kind, responsible, and likeable"; that he "got along well with his siblings" and was "respectful towards his grandparents despite their disapproval of his mixed racial background"; and that he "participated in community activities, kept up in school and got along with his teachers before [an] illness, and made friends easily." *Ibid.*

But as recounted above and recognized by the state courts and, originally, this very panel, Schick *did* put on substantial mitigation evidence, much of it targeting the same "humanizing" theme the Ninth Circuit highlighted. Compare, *e.g.*, *ibid.*, with Record 2317 (death of 10-month-

old sister); *id.*, at 2319, 2325 (difficult childhood); *id.*, at 2314–2315 (family member's addictions); *id.*, at 2314–2315, 2324–2325 (family strife and abuse); *id.*, at 2317, 2319, 2347–2348, 2397 (strong character as a child); *id.*, at 2326–2327 (close relationship with siblings); *id.*, at 2317–2319 (close relationship with grandparents); *id.*, at 2348–2351 (participation in community religious events); see also, *e.g.*, Belmontes' Traverse to Respondent's Return to Pet. for Writ of Habeas Corpus in No. 5–89–0736–EJG–JFM (ED Cal.), p. 64 ("[C]ounsel's presentation was arguably adequate only with respect to [evidence] of 'humanizing' petitioner"). The sentencing jury was thus "well acquainted" with Belmontes' background and potential humanizing features. *Schriro* v. *Landrigan*, 550 U. S. 465, 481 (2007). Additional evidence on these points would have offered an insignificant benefit, if any at all.

The Ninth Circuit also determined that both the evidence Schick presented and the additional evidence it proposed would have carried greater weight if Schick had submitted expert testimony. Such testimony could "make connections between the various themes in the mitigation case and explain to the jury how they could have contributed to Belmontes's involvement in criminal activity." *Belmontes*, 529 F. 3d, at 853. See also *ibid.* (discussing expert's federal habeas testimony on importance of expert testimony). But the body of mitigating evidence the Ninth Circuit would have required Schick to present was neither complex nor technical. It required only that the jury make logical connections of the kind a layperson is well equipped to make. The jury simply did not need expert testimony to understand the "humanizing" evidence; it could use its common sense or own sense of mercy.

What is more, expert testimony discussing Belmontes' mental state, seeking to explain his behavior, or putting it in some favorable context would have exposed Belmontes to the Howard evidence. See *Darden* v. *Wainwright*, 477

U. S. 168, 186 (1986) ("Any attempt to portray petitioner as a nonviolent man would have opened the door for the State to rebut with evidence of petitioner's prior convictions. . . . Similarly, if defense counsel had attempted to put on evidence that petitioner was a family man, they would have been faced with his admission at trial that, although still married, he was spending the weekend furlough with a girlfriend").

If, for example, an expert had testified that Belmontes had a "'high likelihood of a . . . nonviolent adjustment to a prison setting,'" as Belmontes suggested an expert might, see Brief for Appellant in No. 01–99018 (CA9), p. 34, the question would have immediately arisen: "What was his propensity toward violence to begin with?  Does evidence of another murder alter your view?"  Expert testimony explaining *why* the jury should feel sympathy, as opposed simply to facts that might elicit that response, would have led to a similar rejoinder: "Is such sympathy equally appropriate for someone who committed a second murder?"  Any of this testimony from an expert's perspective would have made the Howard evidence fair game.

Many of Belmontes' other arguments fail for the same reason.  He argues that the jury should have been told that he suffered an "extended bout with rheumatic fever," which led to "emotional instability, impulsivity, and impairment of the neurophysiological mechanisms for planning and reasoning."  Amended Pet. for Writ of Habeas Corpus 120.  But the cold, calculated nature of the Howard murder and Belmontes' subsequent bragging about it would have served as a powerful counterpoint.

The type of "more-evidence-is-better" approach advocated by Belmontes and the Court of Appeals might seem appealing—after all, what is there to lose?  But here there was a lot to lose.  A heavyhanded case to portray Belmontes in a positive light, with or without experts, would have invited the strongest possible evidence in rebuttal—the

evidence that Belmontes was responsible for not one but two murders.

Belmontes counters that some of the potential mitigating evidence might not have opened the door to the prior murder evidence. The Court of Appeals went so far as to state, without citation, that "[t]here would be no basis for suggesting that [expert testimony] would be any different if the expert were informed that Belmontes committed two murders rather than one." *Belmontes*, 529 F. 3d, at 869, n. 20. But it is surely pertinent in assessing expert testimony "explain[ing] . . . involvement in criminal activity," *id.*, at 853, to know what criminal activity was at issue. And even if the number of murders were as irrelevant as the Ninth Circuit asserted, the fact that *these* two murders were so different in character made each of them highly pertinent in evaluating expert testimony of the sort envisioned by the Court of Appeals.

The Ninth Circuit noted that the trial court retained discretion to exclude the Howard evidence even if Schick opened the door. *Id.*, at 869–870, n. 20. If Schick had doubts, the Court of Appeals contended, he could have secured an answer in advance through a motion *in limine*. *Ibid.* The trial judge, however, left little doubt where he stood. While ruling that the prosecution could not present the evidence in its case in chief, Record 2254, the judge made clear that it would come in for certain rebuttal purposes, *id.*, at 2256, 2332–2334. When Schick elicited testimony that Belmontes was not violent, for example, the judge ordered it stricken and warned Schick that he would admit the Howard murder evidence—to let the prosecution "go into the whole background"—if Schick pressed forward. *Id.*, at 2334.

In balancing the mitigating factors against the aggravators, the Court of Appeals repeatedly referred to the aggravating evidence the State presented as "scant." *Belmontes*, 529 F. 3d, at 870, 873, 874, 875, 878. That

characterization misses *Strickland*'s point that the reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice. See *Strickland*, 466 U. S., at 695–696, 700. Here, the worst kind of bad evidence would have come in with the good. The only reason it did not was because Schick was careful in his mitigation case. The State's aggravation evidence could only be characterized as "scant" if one ignores the "elephant in the courtroom"—Belmontes' role in the Howard murder—that would have been presented had Schick submitted the additional mitigation evidence. *Belmontes* v. *Ayers*, 551 F. 3d 864, 867 (CA9 2008) (Callahan, J., dissenting from denial of rehearing en banc).

Even on the record before it—which did not include the Howard murder—the state court determined that Belmontes "was convicted on extremely strong evidence that he committed an intentional murder of extraordinary brutality." *Belmontes*, 45 Cal. 3d, at 819, 755 P. 2d, at 354. That court also noted that "[t]he properly admitted aggravating evidence in this case—in particular, the circumstances of the crime—was simply overwhelming." *Id.*, at 809, 755 P. 2d, at 348 (citation omitted). The Ninth Circuit saw the murder differently. It viewed the circumstances of the crime as only "conceivably significant" as an aggravating factor. *Belmontes*, 529 F. 3d, at 871. In particular, the Court of Appeals concluded that "[t]he crime here did not involve . . . needless suffering on the part of the victim." *Ibid.*

We agree with the state court's characterization of the murder, and simply cannot comprehend the assertion by the Court of Appeals that this case did not involve "needless suffering." The jury saw autopsy photographs showing Steacy McConnell's mangled head, her skull crushed by 15 to 20 blows from a steel dumbbell bar the jury found to have been wielded by Belmontes. McConnell's corpse showed numerous "defensive bruises and contusions on

[her] hands, arms, and feet," *id.*, at 839, which "plainly evidenced a desperate struggle for life at [Belmontes'] hands," *Belmontes*, 755 P. 2d, at 354. Belmontes left McConnell to die, but officers found her still fighting for her life before ultimately succumbing to the injuries caused by the blows from Belmontes. Record 3. The jury also heard that this savage murder was committed solely to prevent interference with a burglary that netted Belmontes $100 he used to buy beer and drugs for the night. McConnell suffered, and it was clearly needless.

Some of the error below may be traced to confusion about the appropriate standard and burden of proof. While the Court of Appeals quoted the pertinent language from *Strickland*, that court elsewhere suggested it might have applied something different. In explaining its prejudice determination, the Ninth Circuit concluded that "[t]he aggravating evidence, even with the addition of evidence that Belmontes murdered Howard, is not strong enough, in light of the mitigating evidence that could have been adduced, to rule out a sentence of life in prison." *Belmontes*, 529 F. 3d, at 875. But *Strickland* does not require the State to "rule out" a sentence of life in prison to prevail. Rather, *Strickland* places the burden on the defendant, not the State, to show a "reasonable probability" that the result would have been different. 466 U. S., at 694. Under a proper application of the *Strickland* standard, Belmontes cannot carry this burden.

It is hard to imagine expert testimony and *additional* facts about Belmontes' difficult childhood outweighing the facts of McConnell's murder. It becomes even harder to envision such a result when the evidence that Belmontes had committed another murder—"the most powerful imaginable aggravating evidence," as Judge Levi put it, *Belmontes*, S-89–0736, App. to Pet. for Cert. 183a—is added to the mix. Schick's mitigation strategy failed, but the notion that the result could have been different if only

Per Curiam

Schick had put on more than the nine witnesses he did, or called expert witnesses to bolster his case, is fanciful.

The petition for certiorari and the motion for leave to proceed *in forma pauperis* are granted. The judgment of the Court of Appeals for the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

ROBERT WONG, WARDEN *v.* FERNANDO
BELMONTES, JR.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 08–1263.   Decided November 16, 2009

JUSTICE STEVENS, concurring.

When Fernando Belmontes was sentenced to death in 1982, California Penal Code §190.3(k)* conveyed the unmistakable message that juries could not give any mitigating weight to evidence that did not extenuate the severity of the crime. See *Ayers* v. *Belmontes*, 549 U. S. 7, 27 (2006) (STEVENS, J., dissenting). The trial judge who presided at Belmontes' sentencing hearing so understood the law, and his instructions to the jury reflected that understanding. See *id.*, at 33–34. It was only later that both the California Supreme Court and this Court squarely held that a jury must be allowed to give weight to any aspect of a defendant's character or history that may provide a basis for a sentence other than death, even if such evidence does not "'tend to reduce the defendant's culpability for his crime.'" *Id.,* at 28 (quoting *Skipper* v. *South Carolina*, 476 U. S. 1, 11 (1986) (Powell, J., concurring in judgment)).

The testimony adduced at Belmontes' sentencing hearing described his religious conversion and his positive contributions to a youth rehabilitation program. Neither his own testimony, nor that of the two ministers and the other witnesses who testified on his behalf, made any attempt to extenuate the severity of his crime. Their testimony did, however, afford the jury a principled basis for imposing a sentence other than death. See *Ayers,* 549

———————
*Cal. Penal Code Ann. §190.3(k) (West 1988).

U. S., at 29–31 (STEVENS, J., dissenting). A review of the entire record, especially the colloquy between six jurors and the trial judge, makes it clear to me that "the jury believed that the law forbade it from giving that evidence any weight at all." *Id.,* at 36–39. I therefore remain convinced that in its initial review of this case, the Court of Appeals correctly set aside Belmontes' death sentence.

The narrow question that is now before us is whether the additional mitigating evidence that trial counsel failed to uncover would have persuaded the jury to return a different verdict. The evidence trial counsel might have presented hardly matters, however, because in my view the conscientious jurors' mistaken understanding of the law would have prevented them from giving that additional evidence "any weight at all," *id.*, at 39, let alone controlling weight. Despite my strong disagreement with the Court's decision to review this case once again, I nevertheless agree with the Court's conclusion that trial counsel's failure to present additional mitigating evidence probably did not affect the outcome of the trial.