******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

OSCAR ANDERSON *v.* COMMISSIONER
OF CORRECTION
(SC 18825)

Rogers, C. J., and Norcott, Palmer, Zarella, Eveleigh, McDonald and
Vertefeuille, Js.*

*Argued February 14, 2013—officially released September 2, 2014*

*Daniel J. Foster*, assigned counsel, for the appellant (petitioner).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Catherine Brannelly Austin*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

NORCOTT, J. In this certified appeal,[1] the petitioner, Oscar Anderson, claims that the Appellate Court improperly affirmed the judgment of the habeas court rejecting his claim that he was entitled to a new trial on the ground that his trial counsel rendered ineffective assistance. See *Anderson* v. *Commissioner of Correction*, 128 Conn. App. 585, 598, 17 A.3d 1138 (2011). Specifically, the petitioner contends that the Appellate Court improperly concluded that he was not prejudiced by trial counsel's failure to investigate his claims that he had a history of various sexually transmitted diseases, to introduce medical records concerning that history, to introduce evidence concerning whether the victim had contracted any sexually transmitted diseases, and to present expert testimony concerning the transmission rates of such diseases. The petitioner argues that it is reasonably probable that, had such evidence been introduced at his criminal trial, the result of the trial would have been different. We disagree and, accordingly, affirm the judgment of the Appellate Court.

The record reveals the following relevant facts and procedural history. The petitioner was represented at trial by Attorneys Jeffrey Hutcoe and John Cizik.[2] Following a jury trial, the petitioner was convicted of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2)[3] and one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (1). The Appellate Court affirmed the judgment of conviction on direct appeal; see *State* v. *Anderson*, 86 Conn. App. 854, 856, 864 A.2d 35, cert. denied, 273 Conn. 924, 871 A.2d 1031 (2005); and, on April 30, 2009, the petitioner filed an amended petition for a writ of habeas corpus alleging ineffective assistance of counsel. The facts underlying the petitioner's criminal conviction are set forth in the decision of the Appellate Court affirming the petitioner's conviction on direct appeal. "In 1997, the [petitioner] and the victim's mother met at their place of employment and became romantically involved. Shortly thereafter, when the victim was seven years old, the [petitioner] moved into the mother's household. The mother worked the second shift and was not at home when the victim returned from school. The [petitioner], who worked a different shift, was there. At first the victim and the [petitioner] had a good relationship, but later the victim told people she did not like the [petitioner].

"The [petitioner] punished the victim. The [petitioner] struck her face with his hand when he was angry because she had not done her homework correctly. She did not tell her mother about this because she was afraid of what the [petitioner] might do. On one occasion, the [petitioner] hit her so hard her nose bled. The [petitioner] also compelled her to hold a book bag filled with tapes and clothes on a stick over her head for long

periods of time. On another occasion, he made her kneel on grains of rice. Although the victim did not tell her mother about these events, she confided in her best friend. The friend's mother testified that she noticed behavioral changes in the victim beginning in 1998. The victim, who had been carefree, had become quiet and withdrawn. The victim's grades suffered, and she exhibited a poor attitude at school. After school one day, the victim was terrified to go home on the school bus. Her teacher and school principal conferred with her mother. The victim, however, had not told anyone other than her friend that she was afraid of the [petitioner].

"The victim also testified that the [petitioner] made her rub his back or his feet while he was wearing only his underwear. In addition, he called her into the bedroom and asked her to rub his private parts. One night she woke up and the [petitioner] was attempting to put his penis in her mouth. She reported this to her mother who told her that she must have been dreaming. The victim testified that the [petitioner] had sexual intercourse with her by putting 'his private into [her] butt.' When she was nine and in the fourth grade, the [petitioner] had intercourse with her almost 'every other night or twice a week.' The [petitioner] forced the victim to have oral, anal and vaginal intercourse with him.

"The victim did not tell her mother about the incidents of sexual abuse until shortly after a fire occurred in their home, the day after Thanksgiving, 2000. The victim was spending time with her grandmother who overheard her talking to herself. The grandmother insisted that the victim tell her what she was talking about. The victim told her grandmother of the [petitioner's] sexual abuse. The grandmother informed the mother and immediately took the victim to the police station. The victim gave a statement to the police in which she related the [petitioner's] sexual abuse. The police advised the victim's mother to take her to a hospital that specialized in assessing children who are victims of sexual abuse. The mother followed the advice of the police. The victim was examined by Judith Kanz, a certified pediatric nurse practitioner, who specializes in child forensic medical examinations." (Footnote omitted.) Id., 856–58.

During direct examination, Kanz testified that she had conducted an examination of the victim's vaginal and anal areas in December, 2000. According to Kanz, the examination of the victim's vaginal area indicated signs of repetitive contact and the findings from her examination were consistent with the victim's claims. With respect to the anal examination, Kanz testified that the exam was "generally within normal limits." On cross-examination, Kanz testified that when she examines children who have made allegations of sexual abuse, she determines whether the children have injuries that require medical attention. Kanz indicated that

she would provide any follow-up medical treatment if necessary and specified that sexually transmitted diseases require such treatment. When asked by defense counsel whether she had provided follow-up care to the victim in the present matter, Kanz responded, "No."

"The [petitioner] testified that the victim did not like him because she felt that he was replacing her father and because he planned to marry her mother. He admitted that he disciplined the victim for not doing her homework or her chores. As punishment, he took away the victim's privileges or gave her 'time outs.' He also testified that he made the victim hold a stick on which an empty book bag was suspended for five minutes. The [petitioner] denied that he had sexually assaulted the victim." *State* v. *Anderson*, supra, 86 Conn. App. 858. Thereafter, the jury returned a verdict of guilty as to one count each of sexual assault in the first degree and risk of injury to a child. Id., 856; see also *State* v. *Anderson*, 119 Conn. App. 98, 104–105, 985 A.2d 1096 (2010) (vacating petitioner's sentence on risk of injury charge and remanding case for resentencing).

With respect to the habeas trial, the record reveals the following relevant facts, which the habeas court reasonably could have found. During the criminal trial, the petitioner initially was represented by Hutcoe and subsequently was represented by Cizik. The petitioner testified that he had told both Hutcoe and Cizik that he "had various venereal diseases" and that he did not assault the victim. Hutcoe testified that he recalled the petitioner telling him that he had sexually transmitted diseases and that he remembered asking the petitioner, who had been released on bond, to bring "some kind of proof" from his physician. According to Hutcoe, the petitioner never provided any medical records. Cizik testified that he recalled meeting with the petitioner prior to the criminal trial, but that he did not recall the petitioner telling him that he had a history of sexually transmitted diseases. With respect to discovery, both Cizik and Hutcoe testified that the state had an open file policy and that Kanz' report following her examination of the victim was in that file.

Attorney Richard Meehan, who testified during the habeas trial as an expert witness for the petitioner, opined that reviewing the state's file and obtaining copies of relevant documents from that file was not sufficient to satisfy counsel's discovery obligations in this type of case. In Meehan's opinion, counsel in such a case is obligated to investigate whether the victim or the accused had a sexually transmitted disease during the relevant time frame and that, if the accused had a sexually transmitted disease while the victim did not, counsel would also be obligated to introduce testimony from a medical expert indicating that the accused could not have been the individual who assaulted the victim.

During the habeas trial, the petitioner also presented

the testimony of Timothy Grady, a registered nurse, as an expert witness with respect to sexually transmitted diseases. Grady testified on direct examination that he had treated numerous people infected with sexually transmitted diseases during his approximately twenty year career as a nurse. According to Grady, patients who visit the emergency room for treatment of sexually transmitted diseases often do not wait for culture results. As a result, patients may be treated "prophylactically or empirically . . . for whatever was presumed to be the problem." Grady testified that his review of the petitioner's medical records indicated that the petitioner had presented to the emergency room with complaints of sexually transmitted diseases on multiple occasions throughout 1997, 1998 and 1999, and that the petitioner had been "treated empirically" for gonorrhea and chlamydia on those occasions. Grady clarified that because the petitioner's medical records did not contain culture results for many visits, he did not know if the petitioner was confirmed to have those diseases.

Specifically, Grady testified that when the petitioner visited the emergency room in November, 1997, complaining that he had urethral discharge and painful urination, the petitioner "tested positive for chlamydia" and negative for gonorrhea. In January, 1998, when the petitioner returned to the emergency room complaining of the same symptoms, he was diagnosed with a nonspecific sexually transmitted disease, but the record does not contain any evidence concerning testing or test results. Several months later, in April, 1998, the petitioner was treated for venereal warts, and in June, 1998, the petitioner was diagnosed with a nonspecific sexually transmitted disease after he visited the emergency room complaining of painful urination and a whitish urethral discharge. In October, 1998, when the petitioner again presented to the emergency room with similar symptoms, a culture for chlamydia was negative, but a culture was positive for the presence of the bacteria Haemophilus parainfluenzae, which is not a sexually transmitted disease. Finally, in January, 1999, and October, 1999, the petitioner returned to the emergency room with complaints of urethral discharge and burning urination. Although the petitioner indicated that "it felt like when he had gonorrhea previously," there was "no confirmation of gonorrhea in the [petitioner's medical] records . . . ."

Grady testified that a colorful or whitish discharge and painful urination can be symptoms of sexually transmitted diseases, but he also indicated that some individuals who have sexually transmitted diseases are asymptomatic. During the habeas trial, the petitioner's counsel presented Grady with the following hypothetical: "A man and a woman have a three year sexual relationship during periods involving November of 1997 and . . . the male is infected with chlamydia during that time . . . . Can you state to any . . . reasonable

degree of medical certainty whether or not the female in that hypothetical would have been infected with chlamydia?" In response, the following colloquy between Grady and the petitioner's counsel ensued:

"[Grady]: Well, that would necessarily depend on whether or not the man was infected at the time of the intercourse.

"[The Petitioner's Counsel]: So . . . in November of 1997, I don't think there's a dispute that [the petitioner] was infected with chlamydia at the time. Is that your reading of the record?

"[Grady]: No. He had a definite positive culture at that time. The other times he was treated, he was being treated for [a sexually transmitted disease]. They just— the doctor, when he wrote the note, didn't have the confirmation of the culture, but he was diagnosed with [a sexually transmitted disease] at each and every one of those times.

"[The Petitioner's Counsel]: Does the rate or the ease with which [sexually transmitted diseases] are communicated to or given to a child under ten, does that increase at all because of the child's age?

"[Grady]: Well, yeah. I mean, in general, if a woman is having sex with a man who is infected with chlamydia, [her] chance of acquiring it is 40 percent for each sexual contact. For gonorrhea, its 50 percent for each sexual contact."

Stephen Scholand, a physician specializing in infectious diseases, testified as an expert witness for the respondent, the Commissioner of Correction. Scholand reviewed the petitioner's medical records and found that he suffered from chlamydia in November, 1997. He further testified that the petitioner had "another urethral culture positive for an unusual organism, Haemophilus parainfluenzae. . . . This organism—it's very unusual to cause urethritis; however, based on the clinical symptoms that [the petitioner] presented with, I believe it may have been pathogenic or caused him his symptoms." Counsel for the respondent presented Scholand with the following hypothetical question: "[I]f [the petitioner] had been engaging in vaginal, rectal and oral sex with [an eight, nine, or ten] year old female and he suffered in—it was confirmed in November of 1997 that he suffered [from] chlamydia, would the female victim have contracted chlamydia?" In response, Scholand explained that, with the transmission of sexually transmitted diseases, "nothing is 100 percent," and that the victim may not have contracted the disease. According to Scholand, the rate of transmission from adult to adult is approximately 30 percent.

During cross-examination, Scholand testified that in males, the typical symptoms of chlamydia are urinary discomfort and discharge, whereas in females, symptoms are not present or noticed in up to 75 percent of

patients, and symptoms can range from vague abdominal pain to pelvic inflammatory disease. Many women "never find out they're infected with chlamydia until there's consequences later on . . . ." With respect to a patient under the age of twelve, Scholand testified, "I would not expect her to exhibit symptoms of chlamydia." According to Scholand, if such a patient did have symptoms, they could include painful urination and a serous, or thin discharge.

After cross-examination, in response to questioning by the court, Scholand testified that chlamydia is an intracellular bacterium that can be eliminated from the body through either natural defense processes or antibiotics. Scholand explained that, "[i]f you treat someone with antibiotics, they can be considered cured," and that after treatment with antibiotics, the disease is not transmittable. According to Scholand, the antibiotics that are prescribed to treat chlamydia are usually taken for approximately one week, and the protocol is for "patients not to engage in sexual activity for about a week [after a course of treatment with antibiotics] . . . ." Scholand further testified, during recross-examination, that chlamydia and other infections also can be eradicated by the immune system without the use of antibiotics.

The petitioner testified at the habeas trial that he had no knowledge of the victim having suffered from any type of sexually transmitted disease. The petitioner stated, "as far as I'm concerned, she never—she never contracted anything." The petitioner did not introduce any other evidence at the habeas trial concerning whether the victim suffered or did not suffer from any sexually transmitted diseases during the relevant time frame.

After the close of evidence, the habeas court asked the petitioner's counsel: "What is the earliest date . . . of which there's an allegation that an act of sexual abuse took place? Understand . . . I'm not asking you to admit anything. I'm asking the earliest date upon which an allegation of . . . ." The petitioner's counsel answered: "I believe it was January 1, 1998, and . . . I believe the information reflected at various dates between . . . [the] beginning of January, 1998 and [January] 2000."

The habeas court then issued an oral memorandum of decision, which provides in relevant part: "The issue [in the present case] is whether the petitioner suffered from a sexually transmitted disease, which, in his assertion, should have been communicated to the victim had the events taken place [as alleged]. . . . [I]t is clear from the evidence that was produced that the petitioner on November 16, 1997, did, in fact, test positive for the presence of the chlamydia bacteria. Those same records establish that in November of 1997, the petitioner was treated for this chlamydia infection.

"The testimony by . . . Scholand is that chlamydia can be eliminated from the body if treated with antibiotics. The medical records support that there was an antibiotic treatment, and it would take approximately [one] week to eliminate the active chlamydia infection. There is no further evidence of any chlamydia infection from which the petitioner suffered. . . . January, 1998, is the earliest date of sexual contact. By January of 1998, the petitioner would have been clear of the chlamydia infection. So, the absence of any chlamydia infection in the victim [would not have] serve[d] as an exculpatory piece of evidence. . . .

"[W]hen I look at the evidence that has been presented here, I have the testimony of the petitioner, who testifie[d] that he suffered from various sexually transmitted diseases. I have the medical records to support that. I have no reason to disbelieve that the petitioner did, in fact, suffer from various sexually transmitted diseases. The evidence and the petitioner's testimony is not inconsistent in establishing that the latest date upon which a chlamydia infection existed was November 16, 1997.

"Now, what I don't have is . . . any evidence as to whether the victim in this case did or did not suffer from a chlamydia infection. So, I can't make a conclusive finding as to whether she, in fact, did suffer from such infection. But if I take the premise that the petitioner is putting forward, that he, in fact, was positive for chlamydia in November of 1997, and even if we assume that the evidence would have shown that the victim was negative, that still doesn't go to be exonerating.

"First of all, based upon the testimony that I've received here today, it is highly likely that in January of 1998, when the sexual abuse began, the petitioner was not infectious. Even if he [were] infectious, there is still a 70 percent chance that the partner, in this case unwilling, would not be infected. . . .

"In this case, it's difficult to find that there's been deficient performance [by counsel]. To be sure, the petitioner did inform [counsel] that he had had sexually transmitted diseases; however, the petitioner did not ever produce any sort of medical record to support that [as had been requested by counsel]. . . . But even if the court makes the assumption that it was deficient performance not to investigate the [sexually transmitted disease] issue, it is, however, crystal clear that on the basis of the testimony I've heard today, there's been no prejudice that could have occurred. Had it been investigated and even assuming that the victim was negative for chlamydia, the testimony that I heard today is clear that that does not in any way exonerate the . . . petitioner . . . . [B]ased on the evidence presented, I cannot find that the performance by [counsel] is in

violation of the standard set forth in *Strickland* v. *Washington* [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]." The habeas court then denied the petitioner's request for certification to appeal, from which the petitioner appealed to the Appellate Court.

Before the Appellate Court, the petitioner claimed that counsel had provided ineffective assistance during his criminal trial by failing to introduce exculpatory evidence concerning his history of having sexually transmitted diseases, to retain a medical expert concerning sexually transmitted diseases or to " 'investigate, perform effective discovery or impeach the alleged victim's testimony.' " *Anderson* v. *Commissioner of Correction*, supra, 128 Conn. App. 591. He claimed that, had counsel performed these steps and introduced such testimony, he "would have persuaded the jury that the victim likely would have contracted these diseases from [him] if [he] had been sexually assaulting her in the manner alleged." Id., 591–92. After careful consideration of the record, the Appellate Court majority concluded that the petitioner was not prejudiced by any deficiencies in counsel's performance and affirmed the habeas court's judgment denying the petition.[4] Id., 592; but see id., 599 (*Borden, J.*, dissenting).[5] The petitioner's certified appeal followed.

In the present appeal, the petitioner seeks reversal of the Appellate Court's judgment on the ground that there is a reasonable probability that the outcome of his criminal trial would have been different had counsel introduced exculpatory evidence related to the petitioner's history of sexually transmitted diseases.[6] He claims that this evidence, along with evidence that the victim had not suffered from any sexually transmitted diseases and that patients treated for sexually transmitted diseases in hospital emergency rooms are frequently discharged prior to receiving any culture results, would have raised, in the jury's mind, a reasonable doubt as to the petitioner's guilt. We conclude that the petitioner has failed to demonstrate that he was prejudiced by any deficiency in counsel's performance and, therefore, affirm the judgment of the Appellate Court.

We begin our analysis "with the applicable standard of review and the law governing ineffective assistance of counsel claims. The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 509, 964 A.2d 1186, cert. denied sub nom. *Bryant* v. *Murphy*, 558 U.S. 938, 130 S. Ct. 259, 175 L. Ed. 2d 242 (2009). Historical facts constitute a recital of external events and the credibility of their narrators. . . . *Small* v. *Commissioner of Correction*, 286 Conn. 707, 716, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008). Accordingly, [t]he habeas judge, as the trier of

facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . Id., 717. The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review. . . . *Bryant* v. *Commissioner of Correction*, supra, 510.

"Furthermore, it is well established that [a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington*, [supra, 466 U.S. 686]. This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . As enunciated in *Strickland* v. *Washington*, supra, 687, this court has stated: It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677–78, 51 A.3d 948 (2012). In addition, in order to demonstrate that counsel's deficient performance prejudiced his defense, "the petitioner must establish that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." (Internal quotation marks omitted.) *Michael T.* v. *Commissioner of Correction*, 307 Conn. 84, 101, 52 A.3d 655 (2012).

"In assessing prejudice under *Strickland,* the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . Instead, *Strickland* asks whether it is reasonably likely the result would have been different. . . . This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. . . . The likelihood of a different result must be substantial, not just conceivable." (Citations omitted; internal quotation marks omitted.) *Harrington* v. *Richter*, U.S. , 131 S. Ct. 770, 791–92, 178 L. Ed. 2d 624 (2011).

Moreover, "[i]n making this determination, a court hearing an ineffectiveness claim must consider the

totality of the evidence before the judge or the jury. . . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. . . . The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. 688–89.

In the present case, the petitioner contends that the introduction of evidence that he had suffered from sexually transmitted diseases, coupled with the state's failure to introduce evidence that the victim suffered from sexually transmitted diseases, would have given rise to reasonable doubt as to his guilt. In so stating, however, the petitioner oversimplifies the nature of our inquiry on appeal, which does not begin and end with a consideration of the effect of particular evidence in isolation. Rather, in assessing whether there is a substantial likelihood that the addition of such evidence would have resulted in a different outcome, we must consider the cumulative effect of *all* of the evidence. See *Wong* v. *Belmontes*, 558 U.S. 15, 26, 130 S. Ct. 383, 175 L. Ed. 2d 328 (2009) ("reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice").

Expert testimony at the petitioner's habeas trial established that the petitioner had tested positive for chlamydia in November, 1997. At the same time, testing confirmed that the petitioner did not have gonorrhea. As the habeas court found, however, by the time the alleged abuse of the victim began in January, 1998, the petitioner had been treated with antibiotics and would have been "clear of the chlamydia infection." Furthermore, although Grady's testimony established that the petitioner had visited the emergency room on numerous occasions in 1998 and 1999, and was treated for nonspecific sexually transmitted diseases on those occasions, Grady's testimony also established that *there were no culture results to confirm that the petitioner actually was suffering from a sexually transmitted disease during the relevant time frame*. In fact, the only test results in the record after January, 1998, which were obtained in October, 1998, indicated that the petitioner was *not* suffering from chlamydia. Instead, those test results indicated the presence of a bacterium that is not a sexually transmitted disease and that may have explained the petitioner's symptoms. As Grady

acknowledged, there also was no indication of gonorrhea in the petitioner's medical records.[7]

The petitioner argues, however, that, "[n]otwithstanding the lack of culture results . . . there is, at the very least, a reasonable probability that evidence of [the petitioner's] diagnoses and treatments for [sexually transmitted diseases] would have raised in the jury's mind a reasonable doubt as to his guilt." Even if we assume that the petitioner was suffering from nonspecific sexually transmitted diseases during the relevant time frame, however, Scholand's testimony established that there was only a 30 percent chance[8] that the victim would have acquired chlamydia from the alleged abuse. Moreover, Grady testified that, if the victim had contracted a sexually transmitted disease, she may have been asymptomatic, so that no one, including herself, would have been aware of the infection. Scholand similarly testified that, if the victim had contracted chlamydia, it was unlikely that she would have exhibited any symptoms of the disease. In addition, Scholand indicated that, even if the victim had been infected with chlamydia or another infection, her immune system could have eradicated the infection without antibiotic treatment. Finally, Grady's testimony that the petitioner was treated with antibiotics in October, 1999, coupled with the lack of any testimony to suggest that the petitioner sought any medical treatment after that date, supported the reasonable inference that the petitioner was not suffering from any sexually transmitted diseases for the final year of the alleged abuse. Thus, if the victim had contracted a sexually transmitted disease from the petitioner, she would have contracted it prior to October, 1999. By the time she was examined by Kanz in December, 2000, her body would have had more than one year to recover from any sexually transmitted disease that she had contracted from the petitioner.[9] Clearly, then, even the testimony of the petitioner's expert, Grady, fails to support the petitioner's contention that "[i]n the absence of evidence that [the victim] contracted [a sexually transmitted disease] it is nearly impossible for [the petitioner] to have committed the assaults . . . ."

After reviewing the evidence in its entirety and considering its cumulative effect, we cannot conclude that the petitioner has met his burden of proving that there is a reasonable probability that, but for counsel's failure to introduce evidence related to the petitioner's history of sexually transmitted diseases, the jury would have rendered a different verdict. See *Wong* v. *Belmontes*, supra, 558 U.S. 20. Likewise, we cannot conclude that counsel's alleged errors deprived the petitioner of a fair trial. Not only were the victim's allegations of sexual abuse bolstered by constancy of accusation testimony and testimony that the victim had exhibited behavioral changes during the time frame when the alleged abuse occurred, but Kanz also testified that the results of

the victim's physical examination were consistent with "repetitive penetration and the history that [the victim] gave of repetitive penetration." Moreover, defense counsel's closing argument during the criminal trial focused the jury's attention on the weaknesses in the state's case, namely, the victim's dislike for the petitioner, the fact that the victim's mother initially treated her allegations of abuse as being a dream, and inconsistencies between the victim's testimony and Kanz' report. In particular, counsel emphasized that the victim had testified about the petitioner putting "his private [into her] butt," whereas Kanz' testimony indicated that the findings from her examination of the victim's vaginal area, rather than the victim's anal area, were consistent with repetitive penetration.[10]

Although the state did not present a perfect case during the criminal trial, it did present a strong case, and the defense made certain that the evidentiary weaknesses were apparent to the jury. We are not persuaded that there was a substantial likelihood that the outcome of the present case would have been altered by evidence that the petitioner had suffered from sexually transmitted diseases. This is especially true given that the value of that evidence was significantly undermined at the habeas trial by additional evidence indicating that the diagnoses were unconfirmed and nonspecific, that even if the petitioner had been suffering from a sexually transmitted disease it was far from certain that the victim would have contracted the disease, and that if the victim had contracted a sexually transmitted disease, she very well may have been asymptomatic and her immune system could have eradicated the disease without the need for antibiotics. In sum, the petitioner has not met his burden of proving that had counsel rendered effective assistance, the likelihood of a different result is substantial, and not just conceivable. See *Harrington* v. *Richter*, supra, 131 S. Ct. 792.

Furthermore, we disagree with the petitioner's contention during oral argument before this court that the habeas court improperly narrowed its focus to the issue of whether the petitioner was suffering from chlamydia during the relevant time frame and the likelihood of whether the victim would have contracted chlamydia from the petitioner. The record indicates that when the petitioner asked Grady, hypothetically, to state the likelihood of whether the victim would have contracted chlamydia and gonorrhea from the petitioner, the respondent objected on the ground that the only positive culture result in the record was for chlamydia. The petitioner's counsel noted, summarily, that the petitioner had been treated for sexually transmitted diseases, but then, before the habeas court had issued a ruling, agreed to narrow the hypothetical question to the likelihood of whether the victim would have contracted chlamydia. Subsequently, the majority of the petitioner's cross-examination of Scholand and the habeas

court's questioning of Scholand centered on facts concerning chlamydia. The petitioner does not point to any instance in the record indicating that he believed that the proceedings were unduly focused on issues concerning chlamydia. Likewise, there is no indication that the petitioner filed a motion claiming that the habeas court's memorandum of decision was incomplete, incorrect or inaccurate. See, e.g., *Bauer* v. *Bauer*, 308 Conn. 124, 137, 60 A.3d 950 (2013) (when defendant chose not to challenge factual finding when judgment was rendered, he was precluded from challenging finding for first time on appeal). The petitioner, having acquiesced to the narrowing of questioning during the habeas trial and having failed to challenge the habeas court's memorandum of decision, cannot make these challenges for the first time on appeal.

Finally, we also reject the petitioner's argument that case law from other jurisdictions supports the reversal of his conviction. Specifically, the petitioner cites two cases for the proposition that, the "failure to introduce evidence of a difference in [sexually transmitted disease] status between a defendant and a complainant in a sexual assault case warrants reversal of convictions, without requiring any evidence of the percentage likelihood of transmission, even where there has been only one occasion on which the [sexually transmitted disease] could have been transmitted." See *State* v. *Hamilton*, Docket No. 90-CR-0345, 1993 WL 541608 (Ohio App. December 29, 1993); *State* v. *Steele*, 510 N.W.2d 661 (S.D. 1994). Our reading of those cases, however, indicates that neither case stands for the foregoing proposition or offers any other reasoning to suggest that the petitioner's conviction should be overturned.[11] Moreover, the petitioner's sweeping statement fails to take into account the highly fact specific nature of the issues at stake in matters such as the present case. See *Sears* v. *Upton*, U.S. , 130 S. Ct. 3259, 3266, 177 L. Ed. 2d 1025 (2010) ("*Strickland* inquiry requires . . . probing and fact-specific analysis").

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and ZARELLA, EVELEIGH, McDONALD and VERTEFEUILLE, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] We granted the petitioner's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly affirm the judgment of the habeas court rejecting the petitioner's claim of entitlement to a new trial on the ground of ineffective assistance of counsel?" *Anderson* v. *Commissioner of Correction*, 302 Conn. 905, 905–906, 23 A.3d 1246 (2011).

[2] We refer to Hutcoe and Cizik collectively as counsel.

[3] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ." The petitioner was acquitted of a second count of sexual assault in the first degree in violation of § 53a-70 (a) (2).

[4] The Appellate Court majority did not engage in a thorough analysis of

*Strickland*'s first prong, given its conclusion that the petitioner was not prejudiced by counsel's performance. See *Anderson* v. *Commissioner of Correction*, supra, 128 Conn. App. 591 n.4. The Appellate Court did observe, however, during its analysis of the petitioner's threshold claim that the habeas court had abused its discretion in denying his petition for certification to appeal, that "the evidence quite strongly suggests that counsel should have investigated the petitioner's claims that he had suffered from sexually transmitted diseases throughout the period that the state alleged he had been sexually assaulting the victim and that counsel's failure to do so likely constituted ineffective assistance." Id., 590–91.

[5] In his dissent, Judge Borden concluded that the petitioner had been prejudiced by his counsel's deficient performance. *Anderson* v. *Commissioner of Correction*, supra, 128 Conn. App. 599. Specifically, Judge Borden concluded that "had the petitioner's jury heard the available evidence of his history of sexually transmitted diseases during the relevant time period, the lack of evidence that the victim had contracted any such disease during that period . . . and Grady's testimony, [his] confidence in the reliability of the jury's verdict would [have been] undermined." Id., 615. Judge Borden concluded that, given the victim's testimony that the sexual intercourse had occurred on a repeated basis for a long period of time and "the petitioner's medical records and the habeas court's own findings . . . that the petitioner suffered from both chlamydia and gonorrhea on multiple occasions throughout 1997, 1998 and 1999," the habeas court's limited focus on whether the petitioner had chlamydia in January, 1998, was improper. (Emphasis omitted.) Id., 616. In addition, Judge Borden concluded that competent counsel would have made a persuasive argument to the jury on the basis of Grady's testimony that there is a transmission rate of 40 to 50 percent for each sexual contact between an infected male and a female. Id. Finally, in his dissent, Judge Borden concluded that because the only reasonable construction of the record demanded the inference that the victim did not contract any sexually transmitted disease, and because that inference, in turn, would have cast serious doubt on the reliability of the victim's testimony, "the petitioner would have been able to argue that, absent [evidence that she had contracted a sexually transmitted disease], there was powerful reason to find reasonable doubt about her testimony." Id., 619.

[6] The petitioner also claims that counsel's performance fell below an objective standard of reasonableness and that the Appellate Court improperly applied the applicable standard of review in assessing whether the petitioner was prejudiced by counsel's deficient performance. Because we conclude that the petitioner was not prejudiced by any deficiency in counsel's performance, we need not consider whether the petitioner received effective assistance of counsel at his criminal trial. See *Strickland* v. *Washington*, supra, 466 U.S. 697. In addition, even if we were to assume, arguendo, that the Appellate Court failed to employ the appropriate standard of review in assessing whether the petitioner had established prejudice, we need not address the Appellate Court's analysis given our conclusion that, under the proper application of the standard of review, the petitioner was not prejudiced by counsel's performance.

[7] We disagree with Judge Borden's conclusion, echoed in Justice Palmer's dissenting opinion, that the habeas court found that the petitioner suffered from both chlamydia and gonorrhea on multiple occasions throughout 1997, 1998 and 1999. *Anderson* v. *Commissioner of Correction*, supra, 128 Conn. App. 616. Rather, the memorandum of decision indicates that the habeas court found: (1) that the petitioner suffered from chlamydia in November, 1997; and (2) that the petitioner "did, in fact, suffer from various sexually transmitted diseases." With respect to the latter, the habeas court did not find specifically that the petitioner suffered from chlamydia and gonorrhea and it did not find that he suffered from those diseases throughout 1997, 1998 and 1999. The habeas court did not specify any time period with respect to the second finding.

[8] The habeas court, having observed the testimony of Grady and Scholand first hand, credited Scholand's testimony that the transmission rate for chlamydia is 30 percent, rather than 40 percent. The petitioner contends in his brief that "[t]he likelihood that [the victim] would have contracted the disease would have increased with each encounter," and argues that if the transmission rate for each encounter was 30 percent, "the likelihood of transmission would . . . jump to 51 percent after just two encounters." As the respondent points out, "the petitioner posits a theory of statistical probabilities that finds no support in the record before this court, nor does he cite to any other reliable sources in support of his statistical analysis."

The record, in fact, contradicts the petitioner's argument. During cross-examination, the petitioner's counsel asked Scholand: "Does that number change if they have sex more than once?" Scholand responded, "I would say it doesn't change." In response to continued questioning on this point by the petitioner's counsel, the habeas court stated: "The testimony was there's a 30 percent chance. It's like flipping a coin. It's a 50 percent chance. The fact that you've gotten ten heads in a row, you've still got a 50 percent chance of getting heads." The petitioner, having failed to contest this point at the habeas trial or to present any evidence to support his statistical theory and analysis at that time, cannot rely on such theories or analysis presented for the first time on appeal. See generally *State* v. *Rizzo*, 303 Conn. 71, 96–98 and n.16, 31 A.3d 1094 (2011), cert. denied, U.S. , 133 S. Ct. 133, 184 L. Ed. 2d 64 (2012).

[9] With respect to the victim, the petitioner testified at the habeas trial that he had no knowledge that she had contracted a sexually transmitted disease during the relevant time frame, but he offered no further evidence on that point. During the criminal trial, however, Kanz testified that the victim had not required any follow-up medical care after her examination.

We disagree with Judge Borden's conclusion in his dissent that the only reasonable construction of the record demanded the inference that the victim did not contract any sexually transmitted disease. *Anderson* v. *Commissioner of Correction*, supra, 128 Conn. App. 619. Rather, we conclude that the only reasonable construction of the record demanded the inference that the victim did not have any sexually transmitted diseases *when she was examined by Kanz*. The evidence at the habeas trial clearly established that the victim could have contracted a sexually transmitted disease from the petitioner during 1998 or 1999 without even knowing it and could have overcome the disease without antibiotic treatment *prior to her examination by Kanz in December, 2000.*

[10] The petitioner suggests that, "[i]f evidence of [the petitioner's sexually transmitted diseases] had been introduced [at the criminal trial], if counsel had performed an investigation or consulted an expert on the validity of . . . Kanz' conclusions or the likelihood that [the victim] would have contracted [a sexually transmitted disease from the petitioner], or if counsel had attempted to impeach the credibility of [the victim] through cross-examination, there is a reasonable probability that the outcome of [the criminal] trial would have been different." Despite this contention, the petitioner did not offer any expert testimony at the habeas trial to contradict or undermine Kanz' conclusions. In addition, because the victim did not testify at the habeas trial, there is no indication of whether the petitioner would have been successful in his attempt to undermine the credibility of the victim during cross-examination.

[11] The petitioner's reliance on *State* v. *Hamilton*, supra, 1993 WL 541608, is misplaced because the issue in that case was not whether the petitioner's conviction should have been overturned, but whether the petitioner had alleged sufficient facts to permit him an evidentiary hearing on his claims of ineffective assistance of counsel. Ultimately, after a hearing was ordered and held, the Court of Appeals of Ohio affirmed the trial court's denial of the petition for postconviction relief. *State* v. *Hamilton*, Docket No. 98 C.A. 98, 2000 WL 282303, *6–7 (Ohio App. March 17, 2000). The appeals court rejected the petitioner's claim that there was a reasonable probability that the outcome of his criminal trial would have been different had the jury heard evidence of a second throat culture indicating that the victim did not have gonorrhea, when the petitioner did have gonorrhea. Id., 6*.

Likewise, the petitioner's reliance on *Steele* is misplaced because the issue in that direct appeal was whether the defendant was entitled to a new trial on the ground that the state had violated the defendant's right to a fair trial by withholding exculpatory evidence. *State* v. *Steele*, supra, 510 N.W.2d 666. In *Steele*, the state withheld evidence that the victim had claimed to have contracted chlamydia from the defendant and the defendant did not learn of this claim until after his conviction. Id., 665–66. Testing confirmed that neither the defendant nor his wife was infected. Id., 666. Not only was *Steele* decided in a different procedural context, but unlike the present case, the testing results in that case were confirmed, and the state's case rested entirely on the victim's uncorroborated testimony that the sexual contact was not consensual. Id.